83 Wis.2d 808 (1978)
266 N.W.2d 597
STATE, Plaintiff-Respondent
v.
WASHINGTON, Defendant-Appellant:
DOE, and other persons unknown, Defendants.
No. 76-431.
Supreme Court of Wisconsin.
Argued October 31, 1977.
Decided June 6, 1978.
*813 For the appellant there was a brief by Godfrey & Kahn, S. C., attorneys, and Michael Ash, of counsel, with oral argument by Mr. Ash, all of Milwaukee.
For the respondent the cause was argued by Frederick J. Erhardt, assistant attorney general, and Charles B. Schudson, assistant Milwaukee county district attorney, with whom on the brief were Bronson C. La Follette, attorney general, and E. Michael McCann, Milwaukee county district attorney.
ABRAHAMSON, J.
This appeal is taken from an order of the trial court directing Hazel Washington to produce documents in a John Doe proceeding and from a further order finding her in civil contempt for refusing to obey the order to produce. We affirm both orders.

I.
On December 14, 1976, Hazel Washington, President of Family Outreach Social Services Agency, Inc. (Family Outreach), was served with a subpoena duces tecum signed by Judge Burns. The subpoena required her to produce documents belonging to Family Outreach at a John Doe proceeding presided over by Judge Burns. The John Doe proceeding was being conducted under sec. 968.26, Stats.[1]
*814 Family Outreach provides doctor-prescribed psychotherapeutic services through professional social workers and is compensated primarily through federally financed medical assistance programs. By letters of December 17 and December 20, 1976, Washington informed Judge Burns that she would respectfully decline to produce the documents on the grounds, inter alia, that the subpoena called for the production of documents within the physician-patient privilege (sec. 905.04, Stats.) and that the subpoena violated Family Outreach's fourth amendment right to be secure from unreasonable searches and seizures. Judge Burns requested that Washington and the State brief and argue the various legal questions raised by Washington. Briefs were filed.
On January 7, 1977, Judge Burns convened a closed session hearing as part of the John Doe investigation and heard extensive argument by counsel. At the close of the hearing, Judge Burns indicated that he would sign an order requiring Washington to produce the documents in question. On January 18, 1977, Washington was served with Judge Burns' order requiring her to produce the documents on January 21, 1977.[2] The State's brief on appeal and the record indicate that an informal conference *815 was held on January 20, 1977, attended by Judge Burns and counsel for the State and for Washington.[3]
On January 21, 1977, Judge Burns convened another secret session in the John Doe proceedings. Again, counsel argued the legal issues of the subpoena, and then Washington was called to the stand, advised of her rights against self-incrimination, and asked some preliminary questions which she answered. When asked whether she had brought the documents specified in the subpoena, she declined to produce them, saying she was relying on the "fifth amendment," as well as the legal arguments made by her counsel. The Assistant Attorney General then moved that the John Doe proceedings be adjourned and that a special proceeding be convened in open court pursuant to chapter 295 of the Wisconsin Statutes governing civil contempt. Up until that moment all proceedings had been in closed session, and all "orders" were subject to the secrecy order of the John Doe proceedings. Judge Burns granted the motion and a special proceeding of the court in open session was held, resulting in a court order directing Washington to produce the documents. Washington declined to obey the order, and the court found by a preponderance of the evidence that Washington's refusal constituted contempt of court under chapter 295, Stats. The court ordered that Washington be committed to the Milwaukee county jail for a period of six months or until such time as she complied with the order of the court or until the John Doe proceeding was concluded, whichever came first. Commitment *816 was stayed pending appeal. Appeal was taken from the order of the John Doe judge served on January 18, 1977, and from the order made at the open court hearing on January 21, 1977, both orders requiring Washington to produce the corporate documents, and from the contempt order dated January 25, 1977.

II.
We shall consider first Washington's contention that sec. 968.26, Stats., which gives statutory authority for John Doe proceedings, violates the constitutional requirements concerning separation of powers.
The doctrine of separation of powers, a fundamental principle of American constitutional government, is embodied in the clauses of the Wisconsin Constitution providing that the legislative power shall be vested in a senate and assembly (art. IV, sec. 1), the executive power in a governor and lieutenant governor (art. V, sec. 1) and the judicial power in the courts (art. VII, sec. 2). We have construed these provisions to prohibit one branch of government from exercising the powers granted to the other branches.[4]
In Washington's view, sec. 968.26, Stats., violates the Wisconsin Constitution by investing in the John Doe judge, a member of the judicial branch of government, an investigatory power which properly can be exercised only by members of the executive branch of government. The investigation of crime is part of the executive's duty to assure faithful execution of the laws. Art. V, sec. 4, Wis. Const. Washington asserts that the function of the John Doe judge merges with that of the prosecutor, a representative of the executive branch, as judge *817 and prosecutor jointly search for evidence of criminal activity.
The role of a John Doe judge has not been described in detail in the statutes or the cases. The parties in the instant case portray that role in vastly different ways.[5]
Washington's brief and oral argument characterize the John Doe judge as possessing the power to run a criminal investigation "in combination with prosecutors, policemen, and expert analysts." Washington's description of the John Doe process is, in part, as follows:
". . . Disagreements and unseemly conflicts can and, in Wisconsin, have arisen between judges and District Attorneys or other members of the executive branch concerning the proper outcome of John Doe investigations. When legislators have been targets, judges can and have become embroiled in controversy with the legislative branch over the zeal and methodology of the investigation.
"With the very real possibility of conflict developing between the representative of the judicial branch and the representative of the executive branch, a pattern of informal, secret consultation typically develops. Since conflict might jeopardize the investigation, the more usual result is agreement as to the common investigative enterprise. Thus, the judiciary becomes inextricably entwined with the executive and linked with executive functions. Judges become joint participants with prosecutors and policemen in exhaustive, lengthy searches for crime and criminals.
"John Doe proceedings as they have evolved in Wisconsin have become tremendous engines of inquiry. They may reach to multiple topics and extend for months or *818 years. They typically operate in complete secrecy. They may utilize the combined resources of many executive branch agencies. The judge running such a proceeding commands an army of aides. . . ."
The state portrays the John Doe judge as a neutral detached magistrate whose duty it is to determine on the basis of the evidence presented whether someone will be charged with a crime. The State's brief sketches the John Doe judge as follows:
"Sec. 968.26 does not envisage a prosecutorial role for the judge. There is no language in the statute directing that the judge shall `conduct' or `command' an investigation or act as part of the prosecution. . . . [A] John Doe [judge] must act in a `judicial' manner, and is not a part of the prosecution. . . . John Doe judges serve as neutral magistrates and not as the prosecutor's enforcer.
". . .
". . . A John Doe judge does not act as the field marshal in a sweeping campaign against crime. According to sec. 968.26, a John Doe judge may examine a witness but the witness is produced by the prosecution as is the other evidence presented. The bare fact that the judge may question a John Doe witness is not constitutionally objectionable because, at trial, a judge may interrogate witnesses as well as call them at his own motion. Section 906.14, Stats. The test at trial and in a John Doe is whether a judge conducts himself or herself in a fair and impartial manner.
". . .
"The defendant asserts that the closest parallel to John Does are investigative grand juries. Although the two are similar in some respects, the analogy should be rejected for a number of reasons relating to the disparate roles of the judge and the nature of the proceedings. In State v. Doe, 78 Wis.2d 161, 165, ___ N.W.2d ___ (1977), this court briefly compared the two proceedings and concluded that John Does `afford substantially more protection to a potential accused than does a grand jury.' . . .
". . .
"Furthermore, a witness at a John Doe is entitled to have counsel present during questioning and as shown *819 by the record in this case, the judge may allow witness' counsel to argue before the judge. . . . Neither state nor federal law extends this privilege to grand jury witnesses. . . . [A] John Doe judge issues only a complaint which is in turn subject to attack at a preliminary hearing on probable cause grounds as well as a motion to dismiss. . . . In addition, a John Doe is of a more restricted scope than a grand jury, limited basically to the subject matter of the complaint upon which the John Doe is commenced. Indeed this last factor underscores the role of a John Doe judge as a neutral magistrate who decides legal and factual issues. That is, a John Doe judge has no roving commission to ferret out crime wherever he or she thinks it might be; rather, it is initiated upon the filing of a complaint (though not a formal one), just as other court proceedings are initiated. . . .
"Regarding the functions of a judge in a John Doe, the closest analogy is the general procedure for issuing arrest warrants. Sections 968.01-968.04, Stats."
The confusion as to the role of the judge in a John Doe proceeding is more readily understood if one looks at the development of the institution. John Doe proceedings in this state originated in the latter part of the 19th century. The John Doe was developed by the courts of the state pursuant to a statute (in force since 1839) which provided that a magistrate upon complaint made to him that a crime has been committed "shall examine, on oath, the complainant and any witness produced by him."[6] The original statute was not intended to create a primarily investigative proceeding. Rather, it set forth the procedure governing the determination of probable cause for the issuance of warrants generally, a function served after the 1949 revision of the statute by sec. 354.02, Stats. 1949, and presently by secs. 968.02-.04, *820 Stats. See State v. Davie, 62 Wis. 305, 22 N.W. 411 (1885).
From a relatively early date, however, the jurisdiction conferred upon magistrates was adapted to serve a broader investigatory purpose. See State ex rel. Long v. Keyes, 75 Wis. 288, 44 N.W. 13 (1889); XXIX O.A.G. 400 (1940). In 1949 the legislature gave the investigatory proceeding developed by the courts a statutory basis separate from proceedings for issuance of warrants generally.[7]
As one might expect from its historical antecedents, while the John Doe permits the investigation of alleged or suspected violations of the law, it serves too to prevent reckless and ill-advised prosecution by requiring that a complaint shall not issue except upon a finding of probable cause.[8]
*821 The State analogizes the function of the John Doe judge to that of the magistrate who determines whether there is probable cause to issue an arrest warrant. This analogy, although incomplete, has merit. Under sec. 968.04, Stats., a judge must issue an arrest warrant or a summons in lieu thereof "[i]f it appears from the complaint, or from an affidavit or affidavits filed with the complaint or after an examination under oath of the complainant or witnesses, when the judge determines that this is necessary, that there is probable cause to believe that an offense has been committed and that the accused has committed it." Similarly, in a John Doe proceeding, "[i]f it appears probable from the testimony given that a crime has been committed and who committed it, the complaint shall be reduced to writing and signed and verified; and thereupon a warrant shall issue for the arrest of the accused." Sec. 968.26, Stats.
[1-4]
In attempting to portray the function of the John Doe judge as nothing more than the function of a judge under sec. 968.04, Stats., however, the State ignores a critical difference between sections 968.04 and 968.26, Stats. The complaint upon which the judge passes judgment *822 must set forth facts which, together with any reasonable inferences therefrom, would lead a reasonable person to conclude that a crime has probably been committed and that the defendant named in the complaint is probably the culpable party. State v. Olson, 75 Wis.2d 575, 580-81, 250 N.W.2d 12 (1976). The John Doe complaint, however, need not name a particular accused; nor need it set forth facts sufficient to show that a crime has probably been committed. The John Doe is, at its inception, not so much a procedure for the determination of probable cause as it is an inquest for the discovery of crime in which the judge has significant powers. See Wolke v. Fleming, 24 Wis.2d 606, 612, 613, 129 N.W.2d 841 (1964), cert. den. 380 U.S. 912. Under sec. 968.26, Stats., the John Doe judge "may, and at the request of the district attorney shall, subpoena and examine . . . witnesses to ascertain whether a crime has been committed and by whom committed." The statute confers upon the John Doe judge the power to determine the extent of the examination, as well as the power to determine whether the examination will be secret. The John Doe investigation is essentially limited to the subject matter of the complaint upon which the John Doe is commenced. The John Doe judge has no authority to ferret out crime wherever he or she thinks it might exist.
This court has characterized the John Doe as "primarily an investigative device," and has noted that "John Doe is a feeble investigative device indeed, unless both the district attorney and the magistrate are amenable to using their offices in furtherance of the investigation . . . ." State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 376, 377, 166 N.W.2d 255 (1969).
[5]
By invoking the formal John Doe investigative proceeding, law enforcement officers are able to obtain the *823 benefit of powers not otherwise available to them, i.e., the power to subpoena witnesses, to take testimony under oath, and to compel the testimony of a reluctant witness.[9] Although the judge's subpoena power is important to the prosecution and the judge has broad discretion in conducting the investigation, we reject Washington's characterization of the judge as inevitably the "chief investigator" or as an arm or tool of the prosecutor's office. We do not view the judge as orchestrating the investigation. The John Doe judge is a judicial officer who serves an essentially judicial function. The judge considers the testimony presented. It is the responsibility of the John Doe judge to utilize his or her training in constitutional and criminal law and in courtroom procedure in determining the need to subpoena witnesses requested by the district attorney,[10] in presiding at the examination of witnesses, and in determining probable cause. It is the judge's responsibility to ensure procedural fairness. State v. O'Connor, 77 Wis.2d 261, 284, 252 N.W.2d 671 (1977).
[6]
The John Doe judge should act with a view toward issuing a complaint or determining that no crime has occurred. *824 To the extent that the judge exceeds this limitation, there is an abuse of discretion. State ex rel. Jackson v. Coffey, 18 Wis.2d 529, 545, 118 N.W.2d 939 (1963). If the facts show that the judge has extended the proceeding in duration or scope beyond the reasonable intendment of the statute or has otherwise improperly conducted the proceeding and intends to persist, he or she can be restrained by writ of prohibition for abuse of discretion. State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 401, 402, 126 N.W.2d 96 (1964). As the State noted in its brief, the John Doe judge must "conduct himself as a neutral and detached magistrate in determining probable cause which is the basic function of . . . [the] proceeding."
These limitations on the role of the John Doe judge were well stated by Mr. Justice Hughes in his dissent in State ex rel. Kowalski v. District Court, 254 Wis. 363, 375, 36 N.W.2d 419 (1949), which was quoted by this court with approval in State ex rel. Niedziejko v. Coffey, 22 Wis.2d 392, 401, 126 N.W.2d 96 (1964):
"The implication is plain that when said facts [that the accused and any other person or persons are probably guilty of the offense] appear to the magistrate his duty is to issue the proper warrant. Certainly where he issues a warrant he cannot continue a hearing as an aid to the district attorney in preparing the prosecution."
[7]
The latitude afforded the John Doe judge under the statute is designed to ensure that the proceeding is conducted in an orderly and expeditious manner. The behavior of the John Doe judge should be such as not to impair his or her ability to make an independent determination of probable cause. Accordingly, communications between the complainant or the prosecutor and *825 the John Doe judge relating to the substance of the proceeding should be made part of the record.[11]
Viewing the role of the John Doe judge as we do, we do not believe that the John Doe statute should fall on the ground that it vests non-judicial powers in the judiciary. Although the doctrine of separation of powers is a fundamental principle, it is neither possible nor practicable to categorize all governmental action as exclusively legislative, executive or judicial.[12] The doctrine of separation of powers must be viewed as a general principle to be applied to maintain the balance between the three branches of government, to preserve their respective *826 independence and integrity, and to prevent concentration of unchecked power in the hands of any one branch.[13]
*827 The contemporaneous and practical interpretation of the state constitution supports the conclusion that a John Doe proceeding does not contravene the constitution's mandate of separation of powers. State ex rel. Owen v. Donald, 160 Wis. 21, 111-112, 151 N.W. 331 (1915). As noted previously, John Doe proceedings in this state date back to at least 1889, forty-one years after the adoption of the Wisconsin Constitution. The John Doe is an institution which has been sanctioned by long usage and general recognition.[14]
Washington's counsel rely on In the Matter of Richardson, 247 N.Y. 401, 160 N.E. 655 (1928), in which Mr. Chief Justice Cardozo, writing for a unanimous New York Court of Appeals, held that a statute empowering the governor to designate a judge to take evidence and report back to the governor with recommendations regarding the removal of a public officer was an unlawful delegation to a judge of a non-judicial duty by the executive. This case is inapposite. The New York judge was an active investigator; he was performing part of the executive's power to remove a public officer; the proceeding *828 was not preliminary or ancillary to a judicial proceeding; and the judge's decision was merely advisory to the governor. Justice Cardozo thus differentiated the New York judge's duties from those of a magistrate. We do not believe that the function of Wisconsin's John Doe judge is comparable to the function of New York's investigative judge.
[8]
We are unwilling to hold that sec. 968.26, Stats., violates the Wisconsin constitution. To the extent that the statute may be viewed as granting both judicial and quasi-executive powers to the John Doe judge, we believe that witnesses and persons accused can be protected by appellate court review of John Doe proceedings and of the court orders which are an outgrowth of those proceedings.

III.
Washington further contends that she was denied due process when the same judge who conducted the John Doe investigation presided at the civil contempt proceedings under chapter 295. Chapter 295 does not on its face apply to John Doe proceedings. Sec. 295.01, Stats., provides that "a court of record may find in contempt any person who disobeys any process or lawful order of the court." (Emphasis added.) A John Doe judge is not the equivalent of a court, and a John Doe proceeding is not a proceeding in a court of record.[15] However, the *829 question before us is not whether a subpoena issued by the John Doe judge is a "process" or "order" of the court within sec. 295.01, disobedience of which subjects a person to contempt.[16]
As we noted previously, after Washington refused to produce the documents at the January 21, 1977 John Doe proceeding, the Assistant Attorney General moved that the John Doe proceedings be adjourned and that a special proceeding be convened in open court pursuant to ch. 295. Judge Burns granted this motion, and the doors to the courtroom were opened.
The Assistant Attorney General then moved in open court for an order citing Washington for civil contempt. However, Judge Burns stated that he would not consider the question of contempt until he had made "an order as a judge and a court of record that she produce these records." The Assistant District Attorney orally moved that Hazel Washington comply with the subpoena duces tecum which had been served upon her and that she obey the written order of the "John Doe judge" served on her on January 18th. The court by oral order directed Washington to produce the documents pursuant to the motion of the Assistant District Attorney.[17] Washington's attorney *830 then stated that Washington would not produce the documents. The Assistant District Attorney then moved "pursuant to the entire chapter 295 of the Wisconsin Statutes that Hazel Washington be cited for civil contempt in order to guarantee the production of the documents subpoenaed and ordered to be produced." The court found Washington in contempt under ch. 295.
Thus there is a court order directing Washington to produce the documents (which court order was not obeyed) and a finding of contempt by a court of record. The trial court and counsel structured the case to bring it within chapter 295.
The statutory procedures for civil contempt proceedings differ from those for criminal contempt proceedings. Compare ch. 295, Stats., with secs. 256.03-256.07, Stats.
*831 [9, 10]
Nonsummary criminal contempt proceedings must be conducted by a judge other than the judge conducting the main proceeding, unless the defendant otherwise consents. Sec. 256.04(2) (a), Stats. Civil contempt proceedings are to be had before the same judge who presided at the court which issued the order in question unless he or she is unable to act. Sec. 295.03 (1), Stats.
To support her contention that another judge should have tried the civil contempt charges, Washington relies on In re Murchison, 349 U.S. 133 (1955). In Murchison the United States Supreme Court held that criminal contempt proceedings before the judge who conducted Michigan's "one-man grand jury" proceedings "constituted a denial of the fair and impartial trial required by the due process laws of the Fourteenth Amendment to the Constitution of the United States." Id. at 135.
The State seeks to distinguish Murchison on two bases: (1) the function of the judge in Michigan's grand jury system differs from the function of Wisconsin's John Doe judge,[18] and (2) Murchison involved criminal contempt, not civil contempt. We agree with the first contention. Because the John Doe judge is not a part of the prosecution team, we do not accept as characteristic of the Wisconsin John Doe judge Mr. Justice Rutledge's characterization of Michigan's one-man grand jury: "a single official [in whom is combined] the historically separate powers of grand jury, committing magistrate, prosecutor, trial judge and petit jury." In re Oliver, 333 U.S. 257, 278 (1948).[19]
*832 The State's reliance upon the distinction between civil and criminal contempt is not persuasive.[20] We have recognized that although there are a number of differences between civil and criminal contempt, the two overlap in some respects. Wisconsin v. King, 82 Wis.2d 124, 129, 262 N.W.2d 80 (1978).
The same conduct can constitute both civil and criminal contempt.[21] For example, disobedience to a court orderthe conduct involved in the case at baris an affront to judicial authority (a criminal contempt) and is at the same time detrimental to the interests of a party to the action (a civil contempt). One would proceed against the allegedly contumacious individual in a criminal contempt proceeding if the purpose were to vindicate the authority of the court. If the goal were to *833 benefit a party to the action, one would proceed in civil contempt.
Although imprisonment is a sanction for both civil and criminal contempt, this sanction is viewed as "punitive" when applied to criminal contempt and "remedial" or "coercive" when applied to civil contempt. The civil contemnor, in other words, can avoid imprisonment by obeying the order, disobedience of which gave rise to his incarceration. Sec. 295.02 (4), Stats. Nonetheless jailing to coerce the contemnor to perform an act is very similar to punishing him for his refusal to perform the act.
Deprivation of personal freedomunder whatever legal theoryrequires very careful proceedings. The determination whether a judge other than the John Doe judge should have heard Washington's contempt charge cannot turn solely on the classification of the contempt. Washington's rights in the contempt proceeding must be determined on the basis of fair play and justice.[22] The issue is whether due process requires that the alleged contemnor be granted the safeguard to which Washington claims right, namely, trial by a judge who did not order the production of the records.
[11]
Due process requires a neutral and detached judge. If the judge evidences a lack of impartiality, whatever its origin or justification, the judge cannot sit in judgment. A John Doe judge's bias might arise from a number of factors: (1) the judge might become personally involved; (2) the judge might not be able to participate dispassionately in a contempt proceeding resulting from *834 disobedience of an order he signed for the production of documents; or (3) the very nature of the function of the John Doe judge might foreclose impartiality.
Washington does not contend that the judge became personally embroiled in the controversy because of the nature of Washington's conduct. Her conduct did not constitute the kind of personal attack that, regardless of the judge's reaction or temperament, would render the judge "[un]likely to maintain that calm detachment necessary for fair adjudication." Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971). Nor was Washington's refusal made in a manner which, though not constituting an attack, might still nettle a judge to the extent that he or she could not "hold the balance nice, clear and true between the State and the accused. . . ." Tumey v. Ohio, 273 U.S. 510, 532 (1927), quoted in Taylor v. Hayes, 418 U.S. 488, 501 (1973); see also Mayberry v. Pennsylvania, supra.
[12]
The generally recognized rule is that where the alleged civil contempt consists of disobedience to a court order or process, the judge need not be disqualified from sitting on a contempt hearing.[23] The United States Supreme Court has refused to rest "a constitutional rule of disqualification . . . solely upon . . . disobedience to court orders and criticism of its rulings during the course of a trial." As the Supreme Court has said, "We *835 cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions. . . ."[24]
[13]
We have examined the record in this case, and we find nothing to indicate that there was any abuse of discretion in the judge's failing to disqualify himself. The judge did not become personally embroiled in a controversy with the defendant or her counsel, and the record shows that he conducted the proceedings dispassionately and with decorum befitting a judicial proceeding.
Washington's challenge to the judge cannot succeed if premised on a theory of personal bias or on a theory of bias arising from disobedience of an order of the court in which this judge presided. Therefore, Washington's basic challenge must rest on a theory of "institutional" bias, i.e., that any judge who conducts a John Doe hearing is so involved in the matter as a result of the nature of his function as John Doe judge that he or she cannot preside over any contempt proceedings arising therefrom.
[14]
As we have previously stated, we do not view the John Doe judge as part of the prosecution team.[25] We view *836 the judge as a judicial officer having the dual obligation to enable the prosecution to use the tools of a John Doe proceeding to facilitate the investigation of purported criminal activity and to insure that the witness is treated fairly and protected from oppressive tactics. Because the John Doe judge performs essentially judicial functions, the majority concludes that he or she is no less able than any other judge to determine whether one who has disobeyed the judge's own order should be found guilty of civil contempt.
The author of this opinion believes that a judge other than the John Doe judge should preside over a contempt hearing resulting from John Doe proceedings. Justice, as well as the appearance of justice, dictates that the alleged contemnor be given the opportunity to explain her conduct to a different judge before being held in contempt. In the case at bar the judge has twice ruled that the documents should be produced. A third appearance before the same judge in a contempt proceeding would seem to the alleged contemnor to be a futile exercise. Our system of justice rests in large part on the theory that the judge renders a decision on the basis of information in the record and not on the basis of personal knowledge. While the author does not doubt that a judge can render a decision in a contempt case on the basis of the record and free from the influence of information derived from the judge's knowledge of the secret John Doe proceedings (which information is not available to the alleged contemnor or her counsel), the *837 perception of the alleged contemnor and the public may be otherwise.[26]

IV.
Washington contends that the contempt proceeding was defective because (1) there was no verified petition alleging misconduct, as required by secs. 295.01,[27] 295.03(1),[28] Stats.; (2) there was no opportunity for Washington *838 "to plead by answer affirmative defenses to the charge," as required by sec. 295.03 (3), Stats.;[29] and (3) the State offered no testimony or evidence "to prove by a preponderance of evidence that [Washington was] guilty of misconduct under sec. 295.01, and [had] by that misconduct impeded, impaired, defeated or prejudiced a right or remedy of [the State]" as required by sec. 295.03 (2), Stats.[30]
Washington requested that a petition alleging misconduct be filed. Her request was refused. The trial court apparently concluded that a verified petition was superfluous because of the previous extensive legal arguments on the issues in the John Doe proceeding.[31] Washington refused to waive the requirement of the filing of a verified petition. She did not have the opportunity to plead her affirmative defenses by answer.
After Washington had been found in contempt and had been ordered imprisoned, the State requested that the court made a finding that Washington's "misconduct impeded, impaired, defeated or prejudiced a right or remedy" of the State as required by sec. 295.03 (2), Stats. *839 The court made this finding on the basis of the legal arguments presented to the John Doe judge.
In making the contempt finding, the court relied upon information derived through its role as the presiding judge in the John Doe proceedings. The trial court commented as follows:
". . . her conduct . . . impeded, impaired, defeated or prejudiced a right or remedy of such party. There is no question in my mind that when the Attorney General and the District Attorney are ordered by this, by me, as a John Doe Judge, to carry out and fulfill an obligation of investigatory nature investigating thewhat I was advised was criminal activity on the part of social service agencies who are health providers under Title 19, that the records of a corporation which apparently are suspect or whose conduct is suspect as far as compliance with the provisions of Title 19 are concerned failure to produce those records I find to be impairing, and impeding and defeating.
"The only remedy available to a prosecutorial agency upon a determination by it that a crime has been comitted sic that is the remedy of the complaint and the information so I think the investigatory wheels have come to a halt because of the failure on Mrs. Washington's part to comply with my subpoena and my order to produce them and I have no reluctance in finding on the record before me the State has established that by a preponderance of the evidence as the statute requires."
[15]
The majority of this court holds that although the formalities of Chapter 295 were not followed, Washington had full notice of the contempt charge and full opportunity to make her defense. Washington was allowed a full hearing on her challenge to the sufficiency of the subpoena. The majority concludes that under these circumstances, a formal presentation of the factors which made Washington's refusal to turn over relevant corporate records an "impairment" of the investigation *840 was unnecessary, and the trial court's general conclusory finding was adequate.
Nevertheless, the majority recognizes that it would have been better practice and procedure had the trial court followed the procedures set forth in Chapter 295 and based its findings of "impairment of the investigation" on testimony and facts appearing in the record.
The author of this opinion disagrees with the conclusion reached by the majority. Had the provisions of chapter 295 been followed, Washington would have been accorded notice in a formal pleading, an opportunity to answer, and an evidentiary hearing in open court pursuant to sec. 256.14, Stats. (see note 17), instead of merely the opportunity for oral argument in a closed John Doe proceeding. Releasing the transcript of an oral argument held before a John Doe judge is not, in the author's opinion, an adequate substitute for compliance with the legislative procedure set forth in chapter 295 or sec. 256.14, Stats., and does not provide the appellate court with an adequate record for review. Because the trial court did not comply with the provisions of chapter 295, this court is asked to review a conclusory statement based merely on the John Doe judge's personal knowledge of the John Doe proceedings. It is not possible for this court to examine the judge's personal recollection. The author of this opinion would reverse the order finding contempt on the ground that the trial court did not comply with the requirements of chapter 295.

V.
Washington asserts that the fourth amendment protects corporations as well as individuals from unreasonable intrusions by use of a subpoena duces tecum[32] in *841 a John Doe proceeding.[33] Relying on Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208, 209 (1946), Washington states that a subpoena duces tecum is valid under the fourth amendment if: (1) the investigation is for a lawfully authorized purpose; (2) the documents sought are relevant to the inquiry; and (3) the documents sought are adequate, but not excessive, for the purposes of the John Doe inquiry. See also secs. 968.26, *842 805.07 (3), Stats.[34] The subpoena duces tecum with which she was served, claims Washington, did not meet these criteria.
[16]
Whether or not a subpoena meets the criteria set forth in Oklahoma Press must be determined on three separate occasions: before the John Doe judge issues the subpoena or orders compliance with the subpoena; before the trial court orders compliance with the order of the John Doe judge; and before the trial court makes a finding that one who has disobeyed the order to produce should be held in contempt. Sec. 295.03, Stats.
[17]
The John Doe judge, and the court which subsequently issues the order to produce the document, must know the purpose of the investigation.[35] The purpose of the investigation in issue was set forth in a sworn petition of a special agent of the Division of Criminal Investigation of the Wisconsin Department of Justice pursuant to which the John Doe was convened. The agent asserted apparent violations of chapters 49 (public assistance) and 943 (crimes against property) of the statutes, "pertaining to fraud in connection with the filing of medical assistance claims . . . in Milwaukee county. . . ." *843 Such an investigation is within the purview of a John Doe proceeding.
[18]
The John Doe judge, and the court ordering production of the documents, have to determine whether the documents sought are relevant to the topic of inquiry. The test is whether the information sought is in some manner connected with the suspected criminal activity under investigation.
[19]
The judge conducted the John Doe proceedings and, on the basis of his knowledge of the proceedings, he (both as John Doe judge and presiding judge of the court), decided questions of relevancy without any additional showing by the government. We believe it better practice where the witness challenges the relevancy of the subpoena that the John Doe judge and the court require the State to submit supporting testimony or affidavits showing that the documents are relevant to the investigation which is the subject of the John Doe proceeding.[36] We also recommend that such supporting testimony or affidavits be disclosed to the witness in the John Doe proceeding unless the judge finds that there are circumstances necessitating non-disclosure. We reiterate, *844 however, that a witness is not "entitled as a matter of constitutional right to a specification of a narrow field of inquiry into the commission of crime before questions may be put and answers required." State ex rel. Jackson v. Coffey, 18 Wis.2d 529, 545, 118 N.W.2d 939 (1969).
The judge's and the court's requiring the State to make a minimal showing of the relevancy of the documents assists the judge and the court in balancing the public interests involvedthat of protecting the individual, that of furthering investigation of crime and the expeditious administration of the criminal justice system, and that of providing a record for review. In resisting a subpoena the witness is entitled to make constitutional and other defenses, and the State's minimal showing of relevancy affords the witness protection against the possible abuse of power by a prosecutor through use of the John Doe machinery. Nevertheless, we do not intend that the minimal preliminary showing discussed herein be interpreted as imposing on the John Doe judge (or the court ordering compliance with the subpoena of the John Doe judge) the need to hold an adversary trial or hearing unless the judge or court determines it to be necessary.
Whether the subpoena may be attacked on the ground of over-breadth is a question closely related to the question of relevancy. Under sec. 805.07 (3), the court may quash or modify a subpoena if it is unreasonable and oppressive. The John Doe judge, and the court, must consider whether the documents are sufficiently identified that the witness would in good faith know what he or she is being asked to produce; whether the witness would be harassed or oppressed by the production of the records sought; and whether the period of time covered by the subpoena is unreasonable.[37]
*845 [20]
On the basis of the record before us, we conclude that the court order requiring documents to be produced was proper. The John Doe proceeding could investigate medicaid fraud in Milwaukee county; the documents sought are relevant to the inquiry described in the sworn petition initiating the John Doe proceeding; and nothing in the record demonstrates that the subpoena was unreasonable or oppressive in seeking the documents listed.
Washington complains that she was not adequately advised of the nature and purpose of the John Doe proceeding and that therefore she had no meaningful opportunity to establish that the documents sought were irrelevant and excessive. For this reason, claims Washington, her contempt conviction must be held violative of due process. Washington relies upon Watkins v. United States, 354 U.S. 178 (1957), in which the United States Supreme Court held that a witness at a congressional hearing could not be held guilty of criminal contempt where the "question under inquiry" was "obscure" and was not revealed to the petitioner. The Supreme Court said "Unless the subject matter has been made to appear *846 with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto."
The instant case is unlike Watkins. Watkins involved a legislative investigation conducted by a subcommittee of the Committee on Un-American Activities. The question which the witness refused to answer concerned persons he knew to have been members of the Communist party but who had left the party. These questions were amorphous on their face, raised the issue of violation of Watkins' first amendment rights, and did not seem relevant to any subject matter within the Committee's jurisdiction which at various stages of the proceedings was put forth by the Committee as the one under inquiry. None of the Committee documents and none of the statements of the chairman of the Committee adequately revealed the subject of the investigation. Barenblatt v. United States, 360 U.S. 109 (1959). Watkins "was thus not afforded a fair opportunity to determine whether he was within his rights in refusing to answer and his conviction is necessarily invalid under the Due Process Clause. . . ."
[21]
In the case at bar the subject matter of the inquiry was disclosed. Washington knew that the state was investigating fraud in connection with the filing of medical assistance claims in Milwaukee County. The subject matter of the investigation was within the power of a John Doe proceeding. The relevancy of the documents soughtnamely documents relating to the corporation's contacts with clients eligible for medical assistancewas apparent from the context of the complaint and the face of the subpoena.[38] There was not such vagueness as to *847 create serious doubt as to the subject matter being investigated. Under these circumstances it cannot be said that Washington lacked the information necessary to afford her a fair opportunity to establish the non-relevance of the documents sought or the overbreadth of the request.

VI.
[22]
Asserting that the orders requiring the production of documents violate federal and state medicaid nondisclosure laws, Washington invokes the following statutes:
42 U.S.C. sec. 1396a (7):
*848 "[State plans for medical assistance must] provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of the plan."
Sec. 49.45 (4), Stats.:
"(4) INFORMATION RESTRICTED. The use or disclosure of any information concerning applicants and recipients of medical assistance not connected with the administration of this section is prohibited."
It is apparently Washington's contention that because the John Doe investigation did not serve a purpose "directly connected with the administration" of the medical assistance program, the statutes above cited prohibit disclosure of the information sought by the subpoena duces tecum. We do not accept this narrow construction. To the contrary, we conclude that an investigation directed toward the elimination of fraud in the medical assistance program is an investigation made for a purpose directly connected with the administration of that program.
As Washington's counsel aptly note, the federal regulations are "confusingly prolix." They do, however, require that a state plan for medical assistance include provisions to enable the state to detect or eliminate fraudulent practices violating state law.[39] Criminal sanctions are provided under sec. 49.12, Stats., for *849 making false representations with intent to secure public assistance under any provision of chapter 49.
The Wisconsin Administrative Code directs that a medicaid provider may lose certification if the provider is convicted under federal or state criminal law for its conduct under the medical assistance program, sec. PW-MA 24.05(4) (d), Wis. Adm. Code, or if a provider has "knowingly and without legal basis interfered with investigations or audits conducted by authorized agents of the department [of Health & Social Services]." Sec. PW-MA 24.05(4) (m), Wis. Adm. Code.
Washington appears to contend that because the administration of sec. 49.45 rests with the Department of Health and Social Services, the Milwaukee County District Attorney's office and the Department of Justice, who were involved in the John Doe proceeding, cannot be viewed as performing a function relating to the administration of the Milwaukee program. We need not decide this allegedly jurisdictional defect because the Department of Health and Social Services has approved and cooperated with the John Doe inquiry. The record contains a letter from Manuel Carballo, Secretary, Department of Health and Social Services, dated September 28, 1976 (after the John Doe complaint was filed, but before service of the subpoena on Washington), to Milwaukee District Attorney Michael McCann. The letter refers specifically to Washington and Family Outreach and the Department's "relationship to the Milwaukee County District Attorney's office and the John Doe investigation of Medicaid fraud;" it concludes by saying "we look forward to your continuing cooperation toward achieving our mutual objectives in the control of medical assistance program abuse."
[23]
Washington further contends that the orders requiring the production of documents violate the physician-patient *850 privilege. The documents subpoenaed, she claims include "confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of [a patient's] physical, mental, or emotional condition, among himself, his physician, or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician," which information is protected from disclosure by sec. 905.04 (2) and (3), Stats.[40] We need not determine whether some portions of the records requested fall within the protection of sec. 905.04, Stats. At oral argument, counsel for the State disavowed any interest in obtaining information relating to the nature of the diagnosis or the treatment of the disorder. Indeed, counsel for the State referred with approval to the John Doe judge's in camera inspection of the records of another witness which contained "diagnostic data," as well as the billing and client contact data in which the prosecutor was interested. The prosecutor does not object to the judge's obliterating the "medical" parts of the records before releasing the records to the prosecutor. Under these circumstances, the orders requiring *851 production of the documents would not violate sec. 905.04, Stats.
By the Court.Orders affirmed.
CALLOW, J., took no part.
CONNOR T. HANSEN, J. (concurring).
I concur in the judgment of the court that John Doe proceedings as authorized by sec. 968.26, Stats., do not violate constitutional principles of separation of powers; that considerations of due process do not preclude the John Doe judge from presiding over contempt proceedings arising from the John Doe investigation; that the instant contempt proceedings were not defective for failure to conform to the requirement of ch. 295; that the subpoena duces tecum with which the appellant was served was not constitutionally defective; and that production of the documents in question does not violate federal or state nondisclosure laws or the physician-patient privilege. However, I am unable to join in the opinion of the court.
This court has not been in the practice of writing abstract dissertations on matters unnecessary to the disposition of the cases which come before us. The opinion of the court in the present case departs from this custom; it attempts to resolve with finality difficult questions only tangentially involved here, and to the extent that it does so, it is in the nature of an advisory opinion.
The opinion of the court embodies wide-ranging disquisitions on the nature of John Doe proceedings, civil and criminal contempt, and other matters, no doubt with the intention of clarifying difficult areas of the law and establishing principles for the resolution of questions which may arise in the future. In doing so, however, the opinion expresses views, either directly or by implication, on a number of subjects not at issue in the case at bar. In an abstract sense, I would be inclined to *852 agree with some of the views expressed in the opinion and I would take exception to others.
However, I believe it is inappropriate for this court to express a view on many of the subjects addressed in the opinion of the majority. Restraint is particularly appropriate where the author of an opinion is in less than full agreement with the decision of the court. I believe the court should adhere to the practice of declaring legal principles only in the context of specific factual situations and should avoid expounding more than is necessary for the decision of a given case.
Because I see no reason for making an exception in the present case, I do not join in the opinion of the majority, although I concur in the judgment.
NOTES
[1] "968.26 John Doe proceeding. If a person complains to a judge that he has reason to believe that a crime has been committed within his jurisdiction, the judge shall examine the complainant under oath and any witnesses produced by him and may, and at the request of the district attorney shall, subpoena and examine other witnesses to ascertain whether a crime has been committed and by whom committed. The extent to which the judge may proceed in such examination is within his discretion. The examination may be adjourned and may be secret. Any witness examined under this section may have counsel present at the examination but such counsel shall not be allowed to examine his client, cross-examine other witnesses or argue before the judge. If it appears probable from the testimony given that a crime has been committed and who committed it, the complaint shall be reduced to writing and signed and verified; and thereupon a warrant shall issue for the arrest of the accused. Subject to s. 971.23, the record of such proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used."
[2] Sec. 817.33, Stats., provides that "orders when made by the court may be appealed to the supreme court." The order of a John Doe judge is not an order made by the court within the meaning of sec. 817.33, Stats. However the same order was rendered by a court of record and was also appealed.
[3] The order entitled "Order of Finding of contempt, commitment to county jail, and Stay of Order" is appealable as either a judgment or as a final order affecting a substantial right made by a court in a special proceeding. Secs. 817.09, 817.10, 817.33 (2) (a), Stats. The court order to produce the documents is an intermediate order appearing on the record which involves the merits and necessarily affects the judgment and is therefore reviewable on appeal from the contempt order. Sec. 817.34, Stats.
[4] Goodland v. Zimmerman, 243 Wis. 459, 467, 10 N.W.2d 180 (1943).
[5] The portrayals appear to be based on counsels' experiences and impressions. Counsel have not attempted to describe the judge conducting the John Doe proceedings in the case at bar. There is very little written material available relating to how John Doe proceedings are conducted. For the complete text of Judge Harvey Neelen's Report After a John Doe Quiz, see The Milwaukee Journal, Sunday, January 9, 1949, p. 1 (Legislative Reference Library, Madison, Wis.).
[6] See sec. 4776, Rev. Stats. 1898, which was later renumbered sec. 361.02, Stats. 1925. The title to sec. 361.02, Stats. 1947, includes the words "John Doe proceedings" but the text of the section remains the same and speaks only of examinations before a magistrate. See also State ex rel. Long v. Keyes, 75 Wis. 288, 292, 44 N.W. 13 (1889).
[7] See sec. 354.025, Stats. 1949.

The power of a magistrate to inquire into the commission of a crime is not unique to Wisconsin. Similar proceedings in other states have sometimes been referred to as the one-man grand jury. See Winters, The Michigan One-Man Grand Jury, 28 J. of Am. Jud. Socy. 137, 139-140 (1945); Gallagher, The One-Man Grand JuryA Reply, 29 J. of Am. Jud. Socy. 20 (1945); Scigliano, Inquisitorial Proceedings & Separation of Functions: The Case of the Michigan One-Man Grand Jury, 38 U. of Detroit L. J. 82 (1960); Comment, History of Michigan's One-Man Grand Jury, 33 U. of Detroit L. J. 399 (1956).
The judge commented at one point in the proceeding in the case at bar that the ". . . John Doe proceeding is a one man grand jury as far as I'm concerned."
[8] In State ex rel. Long and Another v. Keyes, 75 Wis. 288, 294, 295, 44 N.W. 13 (1889), this court discussed the purpose and history of the John Doe proceeding as follows:

". . . When this [John Doe] statute was first enacted the common-law practice was for the magistrate to issue the warrant on a complaint of mere suspicion, and he was protected in doing so. This was found to be a very unsafe practice. Many arrests were made on groundless suspicion, when the accused were innocent of the crime and there was no testimony whatsoever against them. The law delights as much in the protection of the innocent as in the punishment of the guilty. This statute was made to protect citizens from arrest and imprisonment on frivolous and groundless suspicion. Davis, Crim. Just. 2-12. Mr. Benedict, in his valuable work on Civil and Criminal Justice, 804, says: `Our statute is framed so as to exclude in a great measure the abuses to which such a practice might lead, and undoubtedly was designed to throw the duty of judging, in this respect, entirely upon the magistrate. It should not regard mere allegations of suspicion, but the grounds of the suspicionthe facts and circumstances must be laid before him, and these should be sufficient to make it appear that a crime has been actually committed, and that there is probable cause for charging the individual complained of therewith.'" (Emphasis supplied.)
See also State ex rel. Niedziejko v. Coffey, 22 Wis.2d 392, 401, 126 N.W.2d 96 (1964).
[9] In Wisconsin, John Doe proceedings have been more frequently used than grand juries. Commentators note that the John Doe is considered superior to the grand jury because it is less expensive and less cumbersome, yet it affords greater protections to witnesses. Brown, The Wisconsin District Attorney and The Criminal Case 13, 17 (2d ed. 1977); Coffey & Richards, The Grand Jury in Wisconsin, 58 Marq. L. Rev. 517, 530 (1974); State v. Doe, 78 Wis.2d 161, 164, 254 N.W.2d 210 (1977).
[10] We refer throughout the opinion to the participation in the John Doe proceedings by a prosecuting attorney. It is usual but not required that an attorney representing the state's interest in criminal prosecution be involved both in initiating and conducting the proceedings. Sec. 968.26, Stats., does not require the participation of the district attorney nor does it set forth the duties of the district attorney.
[11] "A judge should always bear in mind the need of scrupulous adherence to the rules of fair play. He should not permit private interviews, arguments, briefs, or communications designed to influence his decision . . . ." Standard 10, Code of Judicial Ethics, 36 Wis.2d 252, 258 (1967). See also Canon 3(A) (4), Code of Judicial Conduct (ABA) which provides, inter alia, "A judge . . ., except as authorized by law, [shall] neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding."
[12] The legislature has imposed numerous duties on judges. See Wis. Legislative Council Memo No. 20 to Members of Special Committee on Court Reorganization, October 3, 1977, rev. October 13, 1977, for a partial listing of duties now imposed upon judges.

Judges may perform functions characterized as administrative or executive if these functions are in aid of or in execution of judicial functions. Cf. State v. Scholl, 167 Wis. 504, 511, 167 N.W. 830 (1918); State ex rel. Gubbins v. Anson, 132 Wis. 461, 475, 112 N.W. 475 (1907).
Some cases have distinguished between executive or administrative authority vested in a judge and judicial power vested in a court. Blado v. Knoll, 4 Wis.2d 184, 90 N.W.2d 176 (1958); State v. Marcus, 259 Wis. 543, 550, 49 N.W.2d 447 (1951).
We have, however, had occasion to strike down legislative delegations of power which vested non-judicial powers in judges. See Madison Metropolitan Sewerage Dt. v. DNR, 63 Wis.2d 175, 216 N.W.2d 533 (1974); In re City of Fond du Lac, 42 Wis.2d 323, 329, 166 N.W.2d 225 (1969) (involving delegation of legislative authority).
[13] "It is easy to give general definitions of the three great governmental powers. The legislative power is the power which makes the laws; the executive, the power which enforces them; and the judicial, the power which expounds and applies them. Would that it were as easy to apply these general definitions to a concrete case! It is familiar to all who have considered the subject at all that between these several powers, which seem so distinct in their general character, there are great borderlands of power which may be said to approach nearer and nearer until they merge gradually into each other. In these borderlands it is often difficult to tell where one power ends and the other begins." In re Appointment of Revisor, 141 Wis. 592, 597, 124 N.W. 670 (1910).

"Some mixing of powers is permissible. . . ." State v. Lehtola, 55 Wis.2d 494, 498, 198 N.W.2d 354 (1972). See also The Federalist No. 47 (Madison); 1 Davis, Administrative Law sec. 1.09, at p. 68 (1958); 1 Cooper, State Administrative Law 16 (1965); State ex rel. Gleczka v. Conta, 82 Wis.2d 679, 709 n. 3, 264 N.W. 2d 539 (1978).
Frankfurter & Landis, in Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal CourtsA Study in Separation of Powers, 37 Harv. L. Rev. 1010, 1012-1014 (1924), commented as follows:
"That doctrine embodies cautions against tyranny in government through undue concentration of power. The environment of the Constitution, the debates at Philadelphia, the writings in support of the adoption of the Constitution, unite in proof that the true meaning which lies behind `the separation of powers' is fear of the absorption of one of the three branches of government by another. As a principle of statesmanship the practical demands of government preclude its doctrinaire application. The latitude with which the doctrine must be observed in a work-a-day world was steadily insisted upon by those shrewd men of the world who framed the Constitution and by the statesman who became the great Chief Justice. A distinguished student of comparative constitutional law, one of Montesquieu's countrymen, has summed up the significance of his doctrine:
"`The separation of powers is merely a formula, and formulas are not working principles of government. Montesquieu had chiefly aimed to indicate by his formula the aspirations of his times and country. He could not and did not wish to propose a definite and permanent solution of all the questions brought up by the government of men and their long-felt longings for fairness and justice.'
"In a word, we are dealing with what Sir Henry Maine, following Madison, calls a `political doctrine,' and not a technical rule of law. Nor has it been treated by the Supreme Court as a technical legal doctrine. From the beginning that Court has refused to draw abstract, analytical lines of separation and has recognized necessary areas of interaction." (Notes omitted.)
[14] State ex rel. Long v. Keyes, 75 Wis. 288, 295, 44 N.W. 13 (1889); State ex rel. Niedziejko v. Coffey, 22 Wis.2d 392, 396, 126 N.W.2d 96 (1964).

". . . A proceeding before an examining magistrate is not a judicial trial. It is a mere judicial inquiry . . . ." State ex rel. Durner v. Huegin, 110 Wis. 189, 239, 85 N.W. 1046 (1901), quoted in State ex rel. White v. District Court, 262 Wis. 139, 148, 54 N.W.2d 189 (1952).
[15] There is a distinction between the judge and the court. See sec. 967.02 (6), Stats., defining judge and sec. 967.02 (7), Stats., defining court. See also State ex rel. Perry v. Wolke, 71 Wis.2d 100, 106, 237 N.W.2d 678 (1976); Tobin v. Willow River Power Co., 208 Wis. 262, 242 N.W. 480 (1932); State ex rel. Dept. of Agric. v. Aarons, 248 Wis. 419, 423, 22 N.W.2d 160 (1946); Rubin v. State, 192 Wis. 1, 211 N.W. 926 (1927); State v. Dickson, 53 Wis.2d 532, 193 N.W.2d 17 (1972).
[16] Cf. State ex rel. DiSalvo v. Washington County Court, 79 Wis. 2d 27, 33, 255 N.W.2d 459 (1977).
[17] Sec. 968.26, Stats., specifically grants the John Doe judge power to issue subpoenas; it does not specifically authorize the John Doe judge to force compliance with the subpoena or punish noncompliance.

The procedure Judge Burns followed is not prescribed by statute.
The trial court's Order of Finding of Contempt, Commitment to County Jail & Stay of Order indicates that the trial court believed this procedure was necessary "to meet the requirements of sec. 295.02(1) and sec. 256.14 of the Wisconsin Statutes, and of State ex rel. Newspapers, Inc. v. Circuit Court, 65 Wis.2d 66 (1974) . . . ."
Sec. 295.03 (1), Stats., prescribes the procedure in civil contempts. Sec. 256.14, Stats., requires that "the sittings of every court shall be public and every citizen may freely attend the same except when otherwise expressly provided by law on the examination of persons charged with crime, . . . ."
The Newspapers case involved a John Doe proceeding and the holding of an immunity hearing pursuant to sec. 972.08, Stats. In Newspapers the court, relying on secs. 972.08 and 256.14, Stats., held that the immunity proceeding had to be held in open court. In State ex rel. Jackson v. Coffey, 18 Wis.2d 529, 118 N.W.2d 939 (1963); State ex rel. Niedziejko v. Coffey, 22 Wis.2d 392, 126 N.W.2d 96, 127 N.W.2d 14 (1964); and State ex rel. Rizzo v. County Court, 32 Wis.2d 642, 146 N.W.2d 499, 148 N.W.2d 86 (1966), this court held that immunity must be granted by "order of the court" meaning a court of record sitting as such and not the judge or other magistrate conducting a John Doe proceeding.
Apparently the trial court and parties in the case at bar followed the procedure prescribed in the Newspapers case for immunity hearings pursuant to sec. 972.08, Stats. However, this case is distinguishable from Newspapers. As in Newspapers, Washington did assert the privilege of self-incrimination. But unlike Newspapers the state's counsel clearly stated that the state would not move to grant the witness immunity. Thus sec. 972.08, Stats., is not applicable to the case at bar.
[18] The State notes that the Court in Murchison found that the one-man grand jury considered himself a part of the prosecution. 349 U.S. 133, 137, n. 8. See also note 19, infra.
[19] See Scigliano, Inquisitorial Proceedings & Separation of Functions: The Case of the Michigan One-Man Grand Jury, 38 U. of Detroit L. J. 82, 88 (1960), for a description of the role of the Michigan judge-juror as part of the prosecution team.
[20] For a discussion of contempt, see Goldfarb, The Contempt Power (1963); Sedler, The Summary Contempt Power and the Constitution: The View from Without and Within, 51 N.Y.U.L. Rev. 34 (1976); Kuhns, Limiting the Criminal Contempt Power: New Roles for the Prosecutor & The Grand Jury, 73 Mich. L. Rev. 484 (1975); Falco, Federal Criminal Contempts & The Proposed New Federal Criminal Code, 11 Am. Cr. L. Rev. 429 (1973); Dobbs, Contempt of Court: A Survey, 56 Corn. L. Q. 183 (1971); Kutner, Contempt Power:The Black RobeA Proposal for Due Process, 39 Tenn. L. Rev. 1 (1971); Maloney, Civil & Criminal Contempt in Wisconsin, 8 Wis. Continuing Legal Educ. 87 (1968); Beilfuss, Contempt of Court, 31 Wis. Bar Bull. 10 (April 1958); Comment (Gloe), Contempt of Court: Some Considerations for Reform, 1975 Wis. L. Rev. 1117; Note, The Coercive Function of Civil Contempt, 33 U. Chi. L. Rev. 120 (1965); Statute Law Comment, Contempt, 9 Wis. L. Rev. 166, 278 (1934); Shillitani v. United States, 384 U.S. 364 (1966); Gompers v. Buck's Stove & R. Co., 221 U.S. 418 (1911); Wisconsin v. King, 82 Wis.2d 124, 262 N.W.2d 80 (1978); Upper Lakes Shipping v. Seafarer's I. Union, 23 Wis.2d 494, 128 N.W.2d 73 (1964); Upper Lakes Shipping v. Seafarers' International Union, 22 Wis.2d 7, 125 N.W. 2d 324 (1963).
[21] Wisconsin v. King, 82 Wis.2d 124, 129, 262 N.W.2d 80 (1978). See also Upper Lakes Shipping v. Seafarers' International Union, 22 Wis.2d 7, 14, 125 N.W.2d 324 (1963).
[22] "Of course, it is important that the laws should be enforced, and that every violation thereof should be punished. But it is still more important that, as far as possible, every person accused of an offense should have a fair trial before an impartial tribunal." State ex rel. Getchel v. Bradish, 95 Wis. 205, 206, 207 (1897). See also Ward v. Village of Monroeville, 409 U.S. 57, 61 (1972).
[23] Nilva v. United States, 352 U.S. 385, 396 (1957), reh. den. 353 U.S. 931; Brown v. United States, 359 U.S. 41, 48 (1959); In re Puerto Rico Newspaper Guild Local 225, 476 F.2d 856, 859 (1st Cir. 1973); In re La Marre, 494 F.2d 753, 755, 756 (6th Cir. 1974); United States v. Prugh, 479 F.2d 611, 613 (8th Cir. 1973).

"The court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case." United States v. Shipp, 203 U.S. 563, 574 (1906).
[24] Ungar v. Sarafite, 376 U.S. 575, 584 (1964). Cf. United States v. Handler, 476 F.2d 709 (1973).

Some state courts have gone further and have stated that in the interest of sound administration of justice appellate courts should not be forced to undertake the painstaking task, on a case-by-case basis, of evaluating whether a judge has become embroiled or has lost his or her objectivity. These courts have adopted an all-inclusive rule that the trial judge whose order is disobeyed cannot preside over the contempt proceedings: Wollen v. New Mexico, 86 N.M. 1, 518 P.2d 960 (1974); People v. Kurz, 35 Mich. App. 643, 192 N.W.2d 594, 603 (1971). Both these cases were criminal contempt cases.
[25] "Of course, the rule is very plain that no man can be plaintiff or prosecutor in any action, and at the same time sit in judgment to decide in that particular case, either in his own case or in any case where he brings forward the accusation or complaint on which the order is made." The Queen v. London County Council, 1 Q.B. 190, 195, 196, quoted in State ex rel. Getchel v. Bradish, 95 Wis. 205, 208 (1897). See also State ex rel. Ball v. McPhee, 6 Wis.2d 190, 211, 94 N.W.2d 711 (1959).
[26] This court has recognized the possibility that a "judge, whose order or process has been disobeyed, may not be able to decide the contempt issue as impartially as a judge who has had no part in the proceedings giving rise to the citation for contempt." State v. Ramsay, 16 Wis.2d 154, 164, 114 N.W.2d 118 (1962). Accordingly in the Ramsay case we recommended that "[t]he judge who issued the disobeyed order or process should give consideration to whether he should take the discretionary step of disqualifying himself in order to permit another judge to try the contempt issue." 16 Wis.2d at 164. Ramsay was a criminal contempt case which arose before the legislature required criminal contempts to be tried by a different judge. The author of this opinion believes that the rationale of the case is applicable to civil contempt cases.
[27] Sec. 295.01, Stats.:

"Contempt power of courts. Every court of record may find in contempt any person who disobeys any process or lawful order of the court, violates or neglects an official duty, or is otherwise guilty of misconduct, by which act the rights or remedies of a party in an action or proceeding pending or triable in such court or before a court commissioner for the same county may be impaired, impeded, defeated or prejudiced."
[28] Sec. 295.03 (1), Stats.:

"(1) Upon a verified petition alleging misconduct under s. 295.01, the judge in the principal action, or another judge if the original judge is unable to act, may take jurisdiction of the special proceeding of contempt and issue any necessary process, including but not limited to an order to show cause, an attachment to arrest which shall state whether or not the defendant may post cash bail in a given amount or a property bond to assure attendance at court or a writ of habeas corpus if the defendant is in custody."
[29] Sec. 295.03(3), Stats.:

"(3) Any person charged with contempt under this chapter may plead by answer affirmative defenses to the charge, including but not limited to inability to comply with an order or decree of the court. The defendant setting forth such a defense shall have the burden of proving such defense by a preponderance of the evidence."
[30] Sec. 295.03 (2), Stats.:

"(2) The party prosecuting any person for contempt under this chapter shall be required to prove by a preponderance of the evidence that such person is guilty of misconduct under s. 295.01, and has by that misconduct impeded, impaired, defeated or prejudiced a right or remedy of such party."
[31] Although sec. 968.26, Stats., states that "counsel shall not be allowed to examine his client, cross-examine other witnesses or argue before the judge," in this case counsel was permitted to argue. See also State v. Doe, 78 Wis.2d 161, 254 N.W.2d 210 (1977), where the John Doe judge permitted counsel to argue.
[32] The fourth amendment to the United States Constitution provides: "The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." See also Art. I, sec. 11, Wis. Const.

The constitutional guarantee has been held applicable to corporations, G. M. Leasing Corp. v. United States, 429 U.S. 338, 97 S. Ct. 619, 629 (1977), and to grand jury proceedings, Hale v. Henkel, 201 U.S. 43, 76 (1906).
[33] We note the following comments by Chief Judge Friendly in United States v. Doe, 457 F.2d 895, 900 (2d Cir. 1972):

"[T]he Fourth Amendment has not been held to forbid compulsory production of books and papers before a grand jury save in two types of situations: One is stated in Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), where the majority, over the dissent of Mr. Justice Miller and Chief Justice Waite, held that compulsory production of incriminating documents before a grand jury violated not only the self-incrimination clause of the Fifth Amendment, as all the Justices agreed, but the Fourth as well. While Dean Wigmore believed that `the Supreme Court has to a large extent recanted that part of the Boyd dicta which would apply the Fourth Amendment to an order to produce a document, properly a Fifth Amendment concern,' 8 Wigmore, Evidence sec. 2264, at 381-84, n. 4 (McNaughton rev. 1961), we need not consider this, since, as developed at the outset, Mrs. Schwartz was not directed to produce anything that was testimonial in nature. The other situation is reflected in the statement in Hale v. Henkel, supra, 201 U.S. at 76, 26 S. Ct. at 379, 50 L. Ed. 652, that a grand jury subpoena duces tecum too sweeping in its terms `may constitute an unreasonable search and seizure within the Fourth Amendment.' We note that in Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208, 66 S. Ct. 494, 90 L. Ed. 614 (1941), the Court in referring to the problem, spoke of `the Fourth [Amendment], if applicable,' which might mean that protection against too sweeping subpoenas was furnished rather by the due process clause. . . ." See United States v. Dionisio, 410 U.S. 1, 11, 12 (1973).
[34] The fourth amendment "at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be `particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 208 (1946).
[35] This court has held that the relevancy of the requested documents need not be alleged in a subpoena duces tecum but is a matter to be considered in the issuance of and the compelling of compliance with the writ. Nashban Barrel & C. Co. v. Parsons Trucking Co., 49 Wis.2d 591, 611, 182 N.W.2d 448 (1971).
[36] In a grand jury proceeding, the judge is not privy to the secret proceedings. Thus in the federal system, when a judge is asked to enforce a grand jury subpoena, several federal courts have required the government to make a preliminary showing, albeit slight, by affidavit (or such other sworn evidence as the judge within his or her discretion determines) that the matter requested is relevant to the investigation being conducted by the grand jury. In re Grand Jury Proceedings, 486 F.2d 85 (3d Cir. 1973) (Schofield I); In re Grand Jury Proceedings, 507 F.2d 963 (3d Cir. 1975) (Schofield II). See also Universal Mfr. Co. v. United States, 508 F.2d 684 (8th Cir. 1975); In re Grand Jury Subpoenas, 391 F. Supp. 991 (D.R.I. 1975); In re Grand Jury Investigation, 565 F.2d 318 (5th Cir. 1977); In re Grand Jury Investigation, 425 F. Supp. 717 (S.D. Fla. 1977). See Case Note, 5 Seton Hall L. Rev. 378 (1974).
[37] Washington also objects that the order of the trial court directing her to produce the specified documents was oral and not of sufficient specificity and formality. The court in open session directed Washington "to produce these documents pursuant to the motion of the District Attorney." The District Attorney's oral motion was "that Hazel Washington comply with the subpoena duces tecum dated December 22, 1976, and furthermore, that she obey the order of the court dated January 17, 1977." The latter order was written and was made by Judge Burns as a John Doe judge.

The court's order from the bench incorporates by reference the written documents. The order is specific and of sufficient detail that its meaning is not in question.
Sec. 807.11 (1), Stats., provides that an order "is rendered when it is signed by the judge" and it "is entered when it is filed in the office of the clerk of court." Nevertheless, under the circumstances, the majority holds that the oral order directing Washington to produce specified documents was adequate to ground a contempt finding.
[38] The subpoena directed Washington to produce the following records to which objection was made:

1. Daily contact sheets submitted by all former and current social workers, former and current therapists, and other former and current personnel from October 1, 1975, through and including November 30, 1976, reflecting services rendered to Family Outreach Social Service Agency, Inc., clients.
2. Written verification of all physicians' referrals of clients to Family Outreach Social Service Agency, Inc., for whom services were provided between October 1, 1975, through and including November 30, 1976.
3. Appointment books, calendars, listings and any other records showing appointments of Family Outreach Social Service Agency, Inc., clients* with physicians and psychologists, and with Family Outreach Social Service Agency, Inc., social workers, therapists and other personnel for all Family Outreach Social Service Agency, Inc., clients* who received services from Family Outreach Social Service Agency, Inc., between October 1, 1975, through and including November 30, 1976.
4. All "master list(s)" reflecting identification of Family Outreach Social Service Agency, Inc., clients* for whom services were rendered between October 1, 1975, through and including November 30, 1976, clients* therapist(s), addresses, telephone numbers, dates of birth, social security numbers, Medical Assistance Identification numbers, referring physician(s), and dates of physician referrals.
* Refers only to those clients eligible for Title XIX Medical Assistance.
[39] 45 C.F.R. 250.80 (a) (1) provides:

". . . A State plan for medical assistance under title XIX of the Social Security Act must:
"(1) Provide that the State agency will establish and maintain (i) methods and criteria for identifying situations in which a question of fraud in the program may exist, and (ii) procedures developed in cooperation with State legal authorities for referring to law enforcement officials situations in which there is valid reason to suspect that fraud has been practiced. The definition of fraud for purposes of this section will be determined in accordance with State law." (Emphasis added.)
[40] Sec. 905.04, Stats., provides:

"(2) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of his physical, mental or emotional condition, among himself, his physician, or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician.
"(3) Who may claim the privilege. The privilege may be claimed by the patient, by his guardian or conservator, or by the personal representative of a deceased patient. The person who was the physician may claim the privilege but only on behalf of the patient. His authority so to do is presumed in the absence of evidence to the contrary."