STATE

v.

Raynaldo ALMONTE.

No. 93–374–C.A.

Supreme Court of Rhode Island.

July 12, 1994.

Matthew B. Smith, Sp. Asst. Atty. Gen., Providence, for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

WEISBERGER, Acting Chief Justice.

This case comes before us on four questions of law certified by the Superior Court. The four certified questions are as follows:

"1. Does the Privileged Communications Act, § 9–17–24, violate Article 5 of the Rhode Island Constitution as an unconstitutional intrusion upon the function of the Judiciary?

"2. Does the Privileged Communications Act, § 9–17–24, violate Article 1, § 5, of the Rhode Island Constitution by denying a litigant, in this instance the State, the right to fully and fairly litigate its criminal prosecution of the defendant?

"3. Does the Privileged Communications Act, § 9–17–24, confer a legislatively granted privilege? If so, with whom does the privilege rest: the patient/defendant or the health-care provider?

"4. May the Superior Court order a health-care provider to disclose medical records when such disclosure does not meet the requirements of subsections 1 through 5 of section 9–17–24 of the General Laws?"

The facts giving rise to these certified questions are as follows. Raynaldo Almonte, defendant, was charged by indictment with the crime of first-degree arson. The date of the alleged offense was July 18, 1990. The defendant was also charged with witness intimidation, but this charge is not relevant to the certified questions.

Subsequent to defendant's arraignment on the indictment, the state sought the issuance of a subpoena duces tecum in accordance with Rule 17(c) of the Superior Court Rules of Criminal Procedure. The state sought by this subpoena the production of records by Rhode Island Hospital relating to treatment that defendant had received on July 18, 1990, for burn injuries sustained on or about that same date. The state claimed that defendant had admitted having committed the arson with which he was later charged to members of the hospital staff. For purposes of the certified questions these allegations by the state must be taken as true.

The motion justice agreed with the state that the evidence was relevant and material to the prosecution of defendant but expressed doubt concerning her ability to issue the subpoena in light of G.L.1956 (1985 Reenactment) § 9–17–24, as amended by P.L. 1989, ch. 503, § 1, which purports to grant a sweeping privilege against the compelled disclosure of medical information without the consent of the patient, with certain exceptions not applicable to this controversy. Section 9–17–24 reads as follows:

"**Privileged communications to and information obtained by health care providers.**—In every legal action, both civil and criminal, no health care provider shall be competent to testify concerning any information obtained about a patient nor shall he or she be required to produce any documentary evidence obtained about a patient in the course of the customary professional health care relationship, without the consent of the patient, his or her legal guardian, or, if the patient is deceased, his or her next-of-kin, executor or administrator. No health care provider shall be allowed in giving testimony to disclose any confidential communication or health care information, properly entrusted to him or her in his or her professional capacity and within the customary health care relationship, and necessary and proper to enable him or her to discharge medical duties in the usual course of practice, without the

consent of the patient, his or her legal guardian, or, if the patient is deceased, his or her next-of-kin, executor or administrator. Notwithstanding the foregoing, a health care provider may be required to testify or produce documentary evidence regarding the medical condition of a patient:

(1) When a patient raises his or her own medical condition in a legal action;

(2) When a court determines that disclosure of health care information about a person is necessary to a determination of the perceptual capacity of that person as a witness in a legal proceeding and that information is unavailable from any source other than a health care provider;

(3) When a court orders or the parties to a legal action agree to a medical evaluation of a party or witness by a health care provider in order to facilitate the resolution of said legal action;

(4) When the question of competence of a decedent is at issue before the court; or

(5) When said consent is not required pursuant to chapter 37.3 of title 5; provided, however, that any such information shall not be admissible in any proceeding against the patient to whom such information pertains."

In essence the first two certified questions seek our opinion (1) whether this statute is constitutional pursuant to the terms of article 1, section 5, and article 5 of the Constitution of the State of Rhode Island or (2) whether this statute constitutes an encroachment upon the judicial power of the state conferred upon the Supreme Court and such other courts as the General Assembly has established or may from time to time establish. In confronting this question, the court is not considering an issue of first impression. Indeed we have addressed and responded to nearly identical questions regarding a prior statute that is substantially the mirror image of § 9–17–24.

In *Bartlett v. Danti*, 503 A.2d 515 (R.I. 1986), we were called upon to answer a series of certified questions from the Superior Court relating to G.L.1956 (1976 Reenactment) § 5–37.3–6, as enacted by P.L.1978, ch. 297, § 1.[1] That statute, which was entitled the "Confidentiality of Health Care Information Act," created a similar far reaching privilege that prohibited the disclosure of health-care information in the absence of the consent of the patient. That statute set forth the privilege in the following terms:

"Legal process.—(a)(1) Except as provided in subparagraph (2) hereof, confidential health care information shall not be subject to compulsory legal process in any type of proceeding, including, but not limited to, any civil or criminal case or legislative or administrative proceedings or in any pre-trial or other preliminary proceedings, and a patient or his authorized representative shall have the right to refuse to disclose, and to prevent a witness from disclosing, his confidential health care information in any such proceedings."

In *Bartlett* we were faced with the application of the foregoing statute to civil litigation arising out of an automobile accident in which the plaintiff sought highly relevant information from a health-care provider concerning disabilities of the defendant that might have impaired his ability to operate a motor vehicle as well as to testify concerning the events surrounding the accident. The broad privilege enacted by the General Assembly prohibited the obtaining of such information through compulsory legal process without the consent of the defendant. We noted that the effect of the statute was to give uncontrolled discretion over how the litigants and the trial courts of the state adjudicate disputes to the patient "who can decide with impunity whether to permit access to such information." *Bartlett*, 503 A.2d at 517. We further stated:

"We conclude that § 5–37.3–6 is violative of article 1, section 5. We find that § 5–37.3–6, absent the patient consent mandated by § 5–37.3–4(a), precludes litigants from obtaining and introducing material

**1.** When chapter 297, section 1 was published in the Public Laws, the joint committee on legislative services (committee) erroneously numbered the section as chapter 37.2 of title 5. Pursuant to its authority under G.L.1956 (1989 Reenactment) § 22–11–3.4, the committee renumbered the section as chapter 37.3 of title 5 upon publication in the General Laws.

evidence, thereby preventing litigants from effectively presenting their claims before the trier of fact." 503 A.2d at 518.

We compared the operation of that statute to the effect that would result if a member of the Legislature had the right to obtain a continuance at his or her uncontrolled discretion, which issue we considered in *Lemoine v. Martineau*, 115 R.I. 233, 238, 342 A.2d 616, 620 (1975). We held in that case that the separation of powers mandated by article 3 (now article 5) prohibits legislative subversion or exercise of judicial power, citing *Taylor v. Place*, 4 R.I. 324 (1856).

The statute at issue in the case at bar was enacted subsequent to our decision in *Bartlett v. Danti, supra*. It tracks with little modification the language set forth in the earlier statute declared unconstitutional by this court. It uses the word "competent" in respect to the ability of a health-care provider to testify and states that no health-care provider "shall be competent to testify concerning any information obtained about a patient." However, this statute also creates a privilege since, despite the use of the word "competent," such information may be produced with the consent of the patient or his or her legal representative. This statute was enacted a few months subsequent to our decision in *Bartlett* in an obvious attempt to avoid our declaration of unconstitutionality in respect to the earlier statute. This statute refers to exceptions that are set forth in G.L.1956 (1987 Reenactment) chapter 37.3 of title 5 and contains as well certain exceptions in its own provisions.

The distinction between rules of incompetency and rules of privilege is often an elusive concept. Generally, rules of incompetency are exclusionary rules designed to guard against evidence that either is unreliable or may tend unduly to prejudice a party or mislead the finder of fact. On the other hand, rules of privilege have no such objective.

"They do not in any wise aid the ascertainment of truth, but rather they shut out the light. Their sole warrant is the protection of interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *McCormick's Handbook of the Law of Evidence* § 72 at 152 (Cleary 2d ed.1972).

A further distinction between competence and privilege is that normally a party to the litigation must object to incompetent evidence whereas the holder of a privilege may not be an adverse party to the litigation but may well be a person who is entirely a stranger to the litigation, excepting insofar as he or she might be a witness or might have an interest in the material to be disclosed. *Id.*, § 73 at 152–53.

Unless we were to overrule our prior decision in *Bartlett v. Danti*, we must be constrained to answer these certified questions in the same manner as we did in *Bartlett*. We believe that our earlier decision was sound and necessary to prevent legislative encroachment upon the judicial function. We do not doubt the power of the Legislature to create a privilege as a matter of substantive law. *See* Privileged Communications to Clergymen, G.L.1956 (1985 Reenactment) § 9–17–23. However, we cannot allow the Legislature to create such a sweeping privilege with regard to health-care information as to cripple the ability of the Judiciary to try and determine a wide range of civil and criminal cases. We note that in the present statute as in the prior statute the Legislature set aside the need for patient consent in regard to a proceeding before the Workers' Compensation Court or before any court proceeding relating to workers' compensation. This exception was in recognition of the fact that the Workers' Compensation Court could not operate without health-care information.

As we pointed out in *Bartlett*, the distinction between the Workers' Compensation Court and the other trial courts of this state was arbitrary and without rational basis. As much as the Workers' Compensation Court is dependent upon health-care information, so too are the trial courts in many areas of litigation equally dependent upon health-care information in order to reach rational results. This is true in criminal and in civil proceedings.

As an example of the bizarre results of this formidable privilege, let us consider the effect upon a long-enacted statute requiring the reporting of gunshot wounds. General Laws 1956 (1981 Reenactment) § 11–47–48 makes it a criminal offense for any physician who attends to or treats a person for a bullet wound, gunshot wound, or any other injury arising from or caused by the discharge of a gun, pistol, or other firearm, wherever treated, to fail to report such case at once to the police authorities of the town or the city where the physician, hospital, or other institution is located. Under the privilege created by § 9–17–24 (assuming that it does not overrule or supersede § 11–47–48), the physician who reported such a wound to the police could not testify in court about his treatment and observations without the consent of the patient. Thus this privilege would negate the policy of the reporting of gunshot wounds. This would apply even if the person treated were charged with robbery or murder and the medical evidence was vital to the prosecution.

We find nothing in this later statute that in any way changes our constitutional determination in respect to the prior privilege considered in *Bartlett*. This privilege is equally broad and equally intrudes upon the power of the judiciary to perform its function and upon the right of litigants to have access to the courts to resolve their disputes both civil and criminal.

In dissent our colleague points out that many jurisdictions have enacted or adopted privileges in respect to confidential communications between physicians and patients. This assertion is correct. However, there are distinctions among the types of privileges which have been enacted in other jurisdictions.

Unlike the Rhode Island privilege, the scope of the physician-patient privilege in most states is quite narrow, and only certain aspects of the physician-patient relationship are protected. For example, over seventy-five percent of the jurisdictions which recognize the physician-patient privilege protect only "confidential communications" from a patient. *See* Or.Rev.Stat. § 40.235, Rule 504–1(1)(a) & (2) (1993); *see also* Haw.Rev. Stat. § 626–1, Rule 504(a)(3) & (b) (1985); Nev.Rev.Stat. Ann. § 49.225 and § 49.215(1) (Michie 1986). The term "confidential communications" usually includes verbal communications from a patient to a physician, but does not include other "information" such as a physician's or technician's observations or physical examination of a patient. Therefore, the latter types of information would be admissible in a judicial proceeding in most jurisdictions.

This court has always been deferential in construing the powers of the General Assembly. *See, e.g., Kass v. Retirement Board of the Employees' Retirement System of the State of Rhode Island*, 567 A.2d 358, 361 (R.I.1989); *Forte Brothers, Inc. v. State, Department of Transportation*, 541 A.2d 1194, 1196 (R.I.1988); *Gorham v. Robinson*, 57 R.I. 1, 17–19, 186 A. 832, 842 (1936). We have no doubt that the General Assembly could enact a statute dealing with confidential communications between a physician and a patient. However, the statute under consideration goes much further and substantially makes unavailable to the judicial process any health care information whether arising out of a confidential communication, or objective tests or observations. This is an intrusion upon the judicial power of the state which cannot be countenanced.

For the reasons stated, we answer question 1 in the affirmative. We answer question 2 in the affirmative. As a result of our answers to questions 1 and 2, it is unnecessary for us to answer question 3. In respect to question 4, we respond that the Superior Court may order a health-care provider to disclose medical records, whether or not such disclosure meets the requirements of subsections 1 through 5 of § 9–17–24 of the General Laws.

The papers in the case may be remanded to the Superior Court for further proceedings.

LEDERBERG, Justice, dissenting.

I respectfully but strongly dissent from the OPINION on constitutional, legal, precedential, and public-policy grounds.

This case came before the Supreme Court on four questions of law certified to this court by the Superior Court. The questions pertain to G.L.1956 (1985 Reenactment) § 9-17-24, as amended by P.L.1989, ch. 503, § 1, "Privileged communications to and information obtained by health care providers." The facts giving rise to these questions have been described in the OPINION, *supra.*

## I

The first question asks:

"1. Does the Privileged Communications Act, § 9-17-24, violate Article 5 of the Rhode Island Constitution as an unconstitutional intrusion upon the function of the Judiciary?"

Article 5 of the Rhode Island Constitution states:

## "OF THE DISTRIBUTION OF POWERS

The powers of the government shall be distributed into three departments: the legislative, executive and judicial."

Question 1 essentially asks this court whether the Legislature's creation of a privilege that restricts testimony and documentary health-care information impermissibly intrudes on the function of the Judiciary.

This court has consistently interpreted article 5 as granting to the Legislature significant authority. In particular, all powers not specifically granted to the executive and judicial branches of government have been deemed as granted to the legislative department unless prohibited by the constitution. *City of Providence v. Moulton,* 52 R.I. 236, 241, 160 A. 75, 77 (1932). Consequently, the General Assembly is vested with all legislative power except where expressly limited by the constitution. *Gorham v. Robinson,* 57 R.I. 1, 17-18, 186 A. 832, 842 (1936). *Gorham* interpreted article 3 (now article 5) as devoid of any requirement that the judicial branch be independent of the exercise of legislative power. *Id.* at 19, 186 A. at 842.

That the Legislature is vested with the constitutional authority to enact laws, including those that affect the judicial branch, is elemental: "The general assembly shall pass all laws necessary to carry this Constitution into effect." R.I. Const. art. 6, sec. 1. Indeed, article 10, of the Rhode Island Constitution grants judicial power to the Supreme Court and to "such inferior courts as the general assembly may, from time to time, ordain and establish," R.I. Const. art. 10, sec. 1, but grants to the Legislature the authority to prescribe by law "other jurisdiction" to the Supreme Court beyond that delineated in the Constitution and grants to the Legislature the authority to establish and prescribe the jurisdiction of any inferior courts, R.I. Const. art. 10, sec. 2. In addition to establishing such tribunals and delineating their jurisdiction, the General Assembly clearly affects rights and remedies in the state's tribunals through statutes that define crimes and establish sentences, set filing fees, and establish periods of limitations on bringing suit and in statutes that determine the overall budget and the number of judges in the various courts.

It is equally clear that the Legislature may permissibly create the privilege defined in § 9-17-24. In fact, this court, by adopting the Rhode Island Rules of Evidence, has explicitly recognized the Legislature's authority to create such privileges. Rule 501 of the Rhode Island Rules of Evidence provides:

"**Existing privileges retained.**—Nothing in these rules shall be deemed to modify or supersede existing law relating to privilege."

Recognizing that "'the public * * * has the right to every man's evidence'" *except for persons protected by privilege, United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 891 (1950), the Advisory Committee on the Rules of Evidence (committee) explained its formulation of Rule 501 as follows: "This rule retains the present Rhode Island law with respect to privileges. All constitutional, *statutory,* and court-created privileges continue in force by operation of the rule[.]" (Emphases added.) R.I.R.Evid. 501 advisory committee's note. Following the approach of many states, including Minnesota, Iowa, Michigan, and Ohio, this court "left the matter of privileges essentially undisturbed from what it was prior to codification." *Id.*

It follows, therefore, that the authoritative response to question 1 has already been given in the committee's explanation of the merit of its own approach to issues of privilege:

"Since privileges have the effect of excluding relevant evidence, they exist only where a compelling public policy interest in protecting confidential relationships or privacy is recognized. Thus, in this area of the rules it is difficult to draw a bright line between a rule of procedure or evidence that is clearly within the competence and authority of the court to announce, and a rule of substantive law that may be more appropriate for legislative treatment. *By adopting by reference existing privilege statutes and common law constructions, this conceptual problem and any direct confrontation between branches of government is avoided.*

"Further, the Committee believes that this approach will promote both desirable consistency and flexibility in the treatment of privileges. Consistency is promoted by retaining intact the current law with respect to privileges." (Emphasis added.) *Id.*

Thus, the court, by adopting the Rules of Evidence by order dated July 23, 1987, subsequent to the 1986 enactment of § 9–17–24, *see* P.L.1986, ch. 341, § 1, had, in effect, affirmed the privilege enacted by the statute. The committee's note to Rule 501 cites forty-two privileges under the United States Constitution, Rhode Island Constitution, the laws of the state, and common law. The constitutional privilege against compulsory self-incrimination provided by the Fifth Amendment to the United States Constitution and article 1, section 13, of the Rhode Island Constitution and the other privileges that restrict, limit, or prevent the disclosure of information continue in effect, except for one that has been statutorily repealed and one that has been held invalid. This court, in *Bartlett v. Danti,* 503 A.2d 515, 517 (R.I. 1986), held that the protection of health-care information from compulsory legal process under G.L.1956 (1987 Reenactment) § 5–37.3–6(a)(1) impermissibly intruded on the judicial function. 503 A.2d at 517. All other privileges—attorney-client privilege (common

law), newsman's privilege (G.L.1956 (1985 Reenactment) § 9–19.1–2), records of alcoholics and intoxicated persons (G.L.1956 (1990 Reenactment) § 40.1–4–13), public-assistance records (G.L.1956 (1990 Reenactment) § 40–6–12), confidential information of department of employment security employees (G.L.1956 (1986 Reenactment) § 28–39–19, as amended by P.L.1989, ch. 421, § 1), vital statistics records confidentiality (G.L. 1956 (1989 Reenactment) § 23–3–23), department of children, youth, and families (G.L. 1956 (1993 Reenactment) § 42–72–8), confidentiality of bank tax returns (G.L.1956 (1988 Reenactment) § 44–14–23), confidentiality of communications to clergyman (G.L.1956 (1985 Reenactment) § 9–17–23)—virtually identical to § 9–17–24—continue intact. "Why this law [the confidentiality of medical records], was singled out in contrast to the lawyer/client and clergy/parishioner privileges was not, and still is not clear," commented a Providence Journal editorial, *Keeping sacred the privileged relationship,* Providence Journal Bulletin, April 14, 1986, in support of the enactment of § 9–17–24 after this court's *Bartlett* decision.

The majority's holding in *Bartlett* is apparently unique among all the courts in the United States. Although forty-three states and the District of Columbia have enacted physician-patient privileges and all but three states provide psychiatrist/therapist-patient privileges, Harvey F. Wachman, *Hear All, See All, But Silence May be Golden: Confidentiality, Privacy, and Privileged Communication,* 13 Legis. Aspects of Med. Prac. 5 (1985), as of 1989 "no state has withdrawn the privilege after adopting it. In fact, the number of states recognizing the privilege has gradually grown." Robert A. Wade, *The Ohio Physician–Patient Privilege: Modified, Revised, and Defined,* 49 Ohio St. L.J. 1147, 1151 n. 34 (1989). The courts in these jurisdictions have routinely applied such privileges without questioning the constitutionality of the statutes. *See, e.g., People v. Marquez,* 692 P.2d 1089 (Colo.1984); *Collins v. Bair,* 256 Ind. 230, 268 N.E.2d 95 (1971); *State v. George,* 223 Kan. 507, 575 P.2d 511 (1978); *Popp v. Crittenton Hospital,* 181 Mich.App. 662, 449 N.W.2d 678 (1989); *State v. Smorgala,* 50 Ohio St.3d 222, 553 N.E.2d

672 (1990). *Accord Samuelson v. Susen*, 576 F.2d 546, 553 (3d Cir.1978) (Ohio statute providing that deliberations of medical-review committee should be privileged did not deprive party of access to courts).

The majority's response to questions 1 and 2 rests significantly on its *Bartlett* decision that rejected the same public-policy considerations at stake in § 9–17–24. In contrast, the decisions of the supreme courts in other states whose health-care-privilege statutes encompass the "sweep" of the Rhode Island statutes have interpreted and applied their privilege statutes pragmatically (as did this court in adopting the Rules of Evidence), cooperatively, and flexibly in response to their Legislatures' effectuation of the public policy expressed in the statutes. Apparently, no court, except this court, has concluded that such privilege statutes represent an unconstitutional coercion or intrusion into the operation of the judicial branch.

Under many of the statutes, "disclosures, by a physician, against the will of the patient, of communications from the patient or information concerning the patient acquired by the physician in his professional capacity, are incompetent as privileged." 97 C.J.S. *Witnesses* § 293 at 824–25 & n. 93 (1957) (citing approximately thirty-nine cases). The Indiana Civil Code, for example, provides:

"**34–1–14–5. Who are incompetent.**— Except as otherwise provided by statute, the following persons shall not be competent witnesses:

   *   *   *   *   *   *

(3) Physicians, as to matter [matters] communicated to them, as such, by patients, in the course of their professional business, or advice given in such cases." Ind.Code Ann. § 34–1–14–5 (Burns 1986).

Such statutes enable patients to secure appropriate medical treatment by encouraging complete disclosure to a treating health-care provider. *Lewin v. Jackson*, 108 Ariz. 27, 31, 492 P.2d 406, 410 (1972). The beneficial public purpose of such statutes is

" 'not the suppression of truth needed for reaching correct results in litigation, though this may sometimes incidentally occur (as it may also in other instances of

exclusion on the ground of wise policy), *but the purpose is the promotion and protection of confidence of a certain kind, the inviolability of which is deemed of more importance than the results sought through compulsory disclosure in a court of justice.* ' " (Emphasis added.) *Collins v. Bair*, 256 Ind. at 236, 268 N.E.2d at 98.

These "historic privileges of confidential communication protect significant human values in the interest of the holders of the privileges[.]" David W. Louisell, *Confidentiality, Conformity And Confusion: Privileges In Federal Court Today*, 31 Tul.L.Rev. 101, 101 (1956–1957).

Illustrative of numerous supportive judicial decisions on such statutes, the Minnesota Supreme Court noted that "[d]espite persistent academic and judicial criticism of this evidentiary privilege * * * it is nevertheless our duty to enforce it to the full extent reasonably necessary for the attainment of the longstanding legislative policy for which it was created[.]" *State v. Staat*, 291 Minn. 394, 397, 192 N.W.2d 192, 196 (1971). After pointing out that a majority of jurisdictions apply the privilege to criminal proceedings, the *Staat* court, "in view of the broad language of [Minnesota's] statute," ruled by judicial assumption that the privilege in Minnesota would be applied to criminal proceedings as well as to civil proceedings. *Id.* at 398 n. 2, 192 N.W.2d at 196 n. 2.

In Michigan, the Court of Appeals reconciled a broad physician-patient privilege with a requirement that any wound inflicted by a deadly weapon be reported to police. *People v. Traylor*, 145 Mich.App. 148, 151, 377 N.W.2d 371, 372–73 (1985) (per curiam). That court reasoned that if "a general statute, such as the one creating the privilege, conflicts with a specific statute, such as the reporting statute, the specific statute is considered to be an exception to the general statute." *Id.* at 151, 377 N.W.2d at 372. Rhode Island's confidentiality-of-medical-records statute, through a specific exemption, allows release of confidential health-care records "to law enforcement personnel in the case of a gunshot wound reportable under § 11–47–48." Section 5–37.3–4(b)(4).

The Ohio Supreme Court in *Smorgala* confronted Ohio's broad privilege statute that provided in pertinent part, "A physician * * * [shall not testify] concerning a communication made to him by his patient in that relation or his advice to his patient." Ohio Rev.Code Ann. § 2317.02(B)(1) (Page 1991). That court held that under the statute, it was impermissible for the court to create a public-policy limitation on the physician-patient privilege in order to allow otherwise clearly inadmissible evidence in drunk-driving cases. 50 Ohio St.3d at 225, 553 N.E.2d at 676. "Where the words of a statute are free of ambiguity and express plainly and distinctly the sense of the lawmaking body"—clearly the case with Rhode Island's § 9–17–24— "the courts should look no further in their efforts to interpret the intent of the General Assembly." 50 Ohio St.3d at 223, 553 N.E.2d at 674. After determining that the law of privilege was substantive in nature, thereby precluding the court from amending its Rules of Evidence so as to deny the privilege in drunk-driving cases, the Ohio court concluded that "since the legislature has enacted a specific statutory provision in [§] 2317.02(B) to establish and control the physician-patient privilege, there is no vacuum within which we can proceed by common-law pronouncement." 50 Ohio St.3d at 225, 553 N.E.2d at 676. The Ohio court warned that " 'courts should not forget that the legislature's valid laws control policy preferences,' " *id.* at 224, 553 N.E.2d at 675, a caveat not heeded today by this court.

In an important and relevant example of the Judiciary's recognition of legislative authority to enact laws that determine the discovery of evidence, the Supreme Court of Illinois rejected the argument that "the legislative grant of confidentiality * * * violates the separation of powers." *Niven v. Siqueira,* 109 Ill.2d 357, 368, 94 Ill.Dec. 60, 66, 487 N.E.2d 937, 943 (1985). It pointed out that the Illinois court "has upheld legislative grants of confidentiality and legislative creation of privileges. * * * [A]nd we see no reason why the promulgation of rules regarding discovery should be solely a function of the judicial branch." *Id.*

Apparently, no other Supreme Court, aside from the Rhode Island Supreme Court in its anomalous *Bartlett* decision, has found that a privilege or confidentiality statute has interfered with the operation of the Judiciary. Consequently, this court's response to question 1 should not rest on such an inauspicious precedent. Instead, this court should acknowledge that in enacting § 9–17–24, the Legislature has not assumed a power that is " 'central or essential to the operation of' " the Judiciary, *In re Advisory from the Governor,* 633 A.2d 664, 675 (R.I.1993), but rather has exercised its constitutional prerogative to enact laws that establish public policy.

In recognizing that the doctrine of separation of powers must be viewed as a general principle, not as the creation of isolated compartments, the Supreme Court of Wisconsin in *State v. Washington,* 83 Wis.2d 808, 266 N.W.2d 597 (1978), noted that

" 'As a principle of statesmanship the practical demands of government preclude its doctrinaire application. * * * Nor has it been treated by the [United States] Supreme Court as a technical legal doctrine. From the beginning that Court has refused to draw abstract, analytical lines of separation and has recognized necessary areas of interaction.' " *Id.* at 826–27 n. 13, 266 N.W.2d at 606 n. 13 (quoting Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers,* 37 Harv.L.Rev. 1010, 1012–14 (1923–1924)).

Citing its own precedents, the Wisconsin court commented, " '[B]etween these several powers, which seem so distinct in their general character, there are great borderlands of power which may be said to approach nearer and nearer until they merge gradually into each other.' " 83 Wis.2d at 826 n. 13, 266 N.W.2d at 606 n. 13.

The United States Supreme Court has formulated a similarly expansive response in separation-of-powers cases, using a "balancing approach" in *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867, 891 (1977) and in *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 484–85, 109 S.Ct.

2558, 2582, 105 L.Ed.2d 377, 410–11 (1989) (Kennedy, J., concurring). After applying the analysis formulated in those cases, it is clear that § 9–17–24 is not violative of judicial authority but rather represents the Rhode Island Legislature's performance of its core constitutional governmental function, that of establishing public policy. The Legislature has, by providing for the confidentiality of medical records and by establishing a privilege between a patient and health-care provider—each with exceptions that recognize important public-policy concerns—balanced the need for personal privacy in certain communications with the need for probative evidence at trials. *See* Daniel W. Shuman, *The Origins of the Physician–Patient Privilege and Professional Secret*, 39 Sw.L.J. 661, 667 (1985).

In its opinion, the majority has disregarded the substantial precedents that direct this court's review of statutes. First, a duly enacted statute is presumed to be constitutional in form and in application. *State v. Capone*, 115 R.I. 426, 432, 347 A.2d 615, 619 (1975). A challenger to a statute's constitutionality bears the heavy duty of proving the statute's unconstitutionality beyond a reasonable doubt, *id.*, and the state, here the challenger, has not met such a burden. Moreover, this court must presume " 'every reasonable intendment in favor of * * * constitutionality' in order to preserve the statute." *Lynch v. King*, 120 R.I. 868, 875, 391 A.2d 117, 121 (1978). At the same time, a statute may not be construed in such a way that the interpretation of the Legislature's intent "would result in absurdities or would defeat the underlying purpose of [the] legislation." *Landrigan v. McElroy*, 457 A.2d 1056, 1060–61 (R.I. 1983).

This court has consistently applied rules of statutory construction to avoid constitutional issues and to render the provisions of laws consistent and valid, even when a "literal reading of [a] statute[ ] * * * would defeat or frustrate the evident intendment of the legislature." *Town of Scituate v. O'Rourke*, 103 R.I. 499, 507, 239 A.2d 176, 181 (1968). For example, this court has interpreted the statute permitting application by a victim to obtain the name of a juvenile (G.L.1956 (1981

Reenactment) § 14–1–66, as enacted by P.L. 1981, ch. 317, § 1) as also permitting the release of a juvenile's police record notwithstanding the separate statute that provides for confidentiality of such a record (§ 14–1–64, as amended by P.L.1990, ch. 325, § 1). *Matter of Falstaff Brewing Corporation Re: Narragansett Brewery Fire*, 637 A.2d 1047 (R.I.1994).

These cogent considerations clearly support the constitutionality of § 9–17–24, considerations that are essential in the wake of *Bartlett*.

But in fact the constitutional issue in question 1 need not be reached at all. The privilege under § 9–17–24 applies to information "obtained about a patient in the course of the *customary professional health care* relationship." (Emphasis added.) In the case at bar, defendant has invoked the privilege for the purpose of excluding the testimony of a treating physician and others at a hospital, testimony that allegedly included incriminating statements connecting defendant to a fire. Because a putative confession of criminal acts cannot reasonably be construed as information necessary for rendering customary professional health care, such information is not privileged under § 9–17–24. Therefore, testimony from the treating physician and other hospital workers and the hospital's medical records are not privileged under the statute.

Such a conclusion in respect to the admissibility of a defendant's statements is one that has generally been reached under the physician-patient-privilege statutes in other states. For example, a patient's statements to a doctor that he was driving a car at the time of an accident and a patient's statement that he drew a gun have been held to be outside the privilege. *See* Kimberly A. Kmentt, *Private Medical Records: Are they Public Property?* 1987 Med. Trial Tech. Q. 274, 280. Thus, if the information sought was not related to a patient's diagnosis, treatment, or medical care, the privilege generally does not attach. *Id.* at 278; *McCormick on Evidence* § 101 at 378 n. 7 (John W. Strong ed., 4th ed.1992).

The state seeks information that is not privileged under § 9–17–24 and thus such

information is discoverable irrespective of the confidentiality statute. Hence, the constitutionality of § 9–17–24 need not be reached. *See State ex rel. Widergren v. Charette,* 110 R.I. 124, 128, 290 A.2d 858, 860 (1972). That the court today chose to address the constitutional issue creates a troubling precedent for future certified questions and constitutional challenges to statutes.

Question 1 should be answered in the negative. Section 9–17–24 does not violate article 5 of the Rhode Island Constitution and does not represent an unconstitutional intrusion upon the function of the Judiciary. This issue need not be reached, however, because the information sought is not privileged under the Act.

## II

The second question asks:

"2. Does the Privileged Communications Act, § 9–17–24, violate Article 1, § 5, of the Rhode Island Constitution by denying a litigant, in this instance the State, the right to fully and fairly litigate its criminal prosecution of the defendant?"

Article 1, section 5 states:

"**Entitlement to remedies for injuries and wrongs—Right to justice.**—Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and without denial; promptly and without delay; conformably to the laws."

By addressing a threshold issue, question 2 is reduced to summary disposition. Article 1, section 5, entitles "[e]very person" to obtain justice for "injuries or wrongs * * * in one's person, property, or character." The state, however, the party challenging the privilege, is not a person. As the holder of full prosecutorial power, the state requires no additional entitlements. · The entire investigative and police powers of the state can be utilized to gather information on alleged criminal acts. The state's challenge to the Legislature's clear public-policy statement

eliminates the need for careful investigative efforts to obtain evidence in this case. But, as noted *supra,* the requested information is not, in any case, protected under § 9–17–24. That issue aside, § 9–17–24 stands as no greater barrier to a person's remedies than the numerous other privileges, statutes of limitations, and statutory requirements of the General Laws of Rhode Island. This court has held, for example, that although application of the statute of limitations deprived a plaintiff of a remedy against later-added defendants, such a statutory limitation did not result in an unconstitutional deprivation of that plaintiff's rights. *Young v. Park,* 116 R.I. 568, 573, 359 A.2d 697, 700 (1976). In addition, the requirement under G.L.1956 (1985 Reenactment) § 9–1–29 that claimants bring actions in tort against contractors within ten years of the substantial completion of a project has been held not to violate article 1, section 5. *Walsh v. Gowing,* 494 A.2d 543, 547–48 (R.I.1985). And in upholding the notice requirement of G.L.1956 (1989 Reenactment) § 24–5–14, this court reasoned that article 1, section 5, should not be interpreted to bar the Legislature from enacting laws that may limit a party from bringing a claim in the courts. *Hareld v. Napolitano,* 615 A.2d 1015, 1017 (R.I.1992).

Therefore, question 2 should be answered in the negative.

## III

The third question asks:

"3. Does the Privileged Communications Act, § 9–17–24, confer a legislatively granted privilege? If so, with whom does the privilege rest: the patient/defendant or the health-care provider?"

Section 9–17–24 confers a legislatively created privilege, the authority for which is constitutional and acknowledged in Rule 501 of the Rhode Island Rules of Evidence. *See* discussion *supra* question 1. "The physician-patient statutes, though commonly phrased in terms of incompetency, are nevertheless held to create merely a privilege for the benefit of the patient." *McCormick On Evidence* § 103 at 383 & n. 1 (citing John H. Wigmore, *Evidence In Trials At Common*

*Law* (John T. McNaughton rev.1961)). "The patient is the person * * * [who] is the holder of the privilege." *Id.* § 102 at 381.

### IV

The fourth question asks:

"4. May the Superior Court order a health-care provider to disclose medical records when such disclosure does not meet the requirements of subsections 1 through 5 of section 9–17–24 of the General Laws?"

Because this court should uphold the constitutionality of § 9–17–24, the response to question 4 must be in the negative. Medical records, however, are not only discoverable under §§ 9–17–24(1)–(5), but also are admissible under Rule 803(4) of the Rhode Island Rules of Evidence (Hearsay Exceptions, Statements for Purposes of Medical Diagnosis or Treatment), or under other evidentiary rules. Whether such disclosures violate a First Amendment privacy right or constitute an invasion of the right to privacy protected by the Fourth Amendment would need to be considered, however.

The United States Supreme Court has articulated the persuasive public purposes behind even the most sweeping privilege statutes:

"The privileges between priest and penitent [for example in Rhode Island under § 9–17–23], attorney and client [by common law in Rhode Island], and physician and patient [under § 9–17–24 in Rhode Island] * * * are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor[.] * * * The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation * * *. Similarly, the physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186, 195 (1980).

The Rhode Island General Assembly, through its enactment of § 9–17–24, has affirmed the importance of a patient's right to privacy and of the significant human values ensconced in the privilege. " 'For many people, judges, lawyers and laymen, the protection of confidential communications from enforced disclosure has been thought to represent rights of privacy * * * too important to relinquish to the convenience of litigants. Growing concern * * * with the increase in official prying and snooping into the lives of private individuals has reinforced support for the traditional privileges.' " Robert S. Catz & Jill J. Lange, *Judicial Privilege,* 22 Ga. L.Rev. 89, 114 (1987).

Along with federal statutes that are creating rights similar to the physician-patient privilege, (*see, e.g.,* 42 U.S.C.A. § 242a(b) (West Supp.1994) on mental health and 42 U.S.C.A. § 260(d) (West 1991) on treatment of drug addicts), the physician-patient privilege may be emerging as an aspect of federal constitutional guarantees of the right to privacy. *See Doe v. Bolton,* 410 U.S. 179, 197, 93 S.Ct. 739, 750, 35 L.Ed.2d 201, 216 (1973). Although such privacy issues have focused on reproductive decisions, similar concerns for privacy arise in mental disorders and controversial medical conditions such as Acquired Immune Deficiency Syndrome. Privacy issues requiring constitutional protection will expand as discoveries from the Human Genome Project reveal the complete menu of each individual's genetic components, including the flaws in one's genetic makeup and the likely time and nature of one's death. Information on whether an individual carries a gene for Alzheimer's disease or early heart disease would be of interest to employers as well as insurance companies. *See* Robert C. Deegan, *The Gene Wars: Science, Politics, & the Human Genome* (1993).

The Legislature had spoken by enacting § 9–17–24, but now must speak again. Courts should not "substitute their own pleasure to the constitutional intentions of the legislature. * * * [A]nd if they should be disposed to exercise *will* instead of *judgment,* the consequence would equally be the substitution of their pleasure to that of the legislative body." The Federalist No. 78, at

526 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). " 'Were the power of judging joined with the legislative * * * *the judge* would then be *the legislator*, ' " The Federalist No. 47, at 326 (James Madison) (Jacob E. Cooke ed., 1961), and that clearly is violative of article 5. And although "Judges have, of course, the power, though not the right, to ignore the mandate of a statute, and render judgment in despite of it," Benjamin N. Cardozo, *The Nature of the Judicial Process,* 129 (1921), *reprinted in Selected Writings of Benjamin Nathan Cardozo* 107, 160 (Margaret E. Hall ed., 1947), our Constitution is not well served by such an undertaking.

Section 9–17–24 embodies a sound principle. "Once the individual's control of his or her physical and mental health records becomes generally subservient to the adversary legal process, a precious right will be lost." *Keeping sacred the privileged relationship,* Providence Journal Bulletin, April 14, 1986.