DECISION
The defendant, Salvatore Guido, is charged with violating General Laws § 31-27-2.6, Driving Under the Influence of Liquor, resulting in serious bodily injury. He moves to suppress evidence of his blood alcohol taken by personnel at Rhode Island Hospital while undergoing diagnosis and treatment for injuries he received in the collision.
Defendant raises three separate grounds for his motion to suppress. The first alleges the results of the blood test were obtained in violation of his right to be free from illegal searches and seizures, because no search warrant was obtained before the blood was drawn. He next argues that the results should not be admitted because the test was taken without his consent and the procedural safeguards set out in § 31-27-2 and §31-27-3 were not followed. Finally, the defendant maintains the use of his health care information violate § 9-17-24 of the General Laws entitled "Privileged Communications To And Information Obtained By Health Care Providers."
An evidentiary hearing was conducted during which the State maintained that the performance of a blood alcohol test by personnel at Rhode Island Hospital in no way implicated the Fourth Amendment or Article 1, Section 6 of the Rhode Island Constitution. The State relied upon State v. Lussier,511 A.2d 958 (R.I. 1986), as controlling on this issue and for its position that neither consent nor the requirements of § 31-27-3
need be complied with where there is no arrest and no police involvement in the taking of the blood test.
Finally, the recent case of State v. Almonte, 644 A.2d 295
(R.I. 1994) recently decided by the Rhode Island Supreme Court in which the Court reaffirmed its prior decision in Bartlett v.Danti, 503 A.2d 515 (R.I. 1986), and declared that § 9-17-24
violates Article 1, Section 5 and Article 5 of the Rhode Island Constitution as an unconstitutional intrusion upon the function of the Judiciary.
The facts giving rise to this Criminal Information are sketchy at best. On May 15, 1993 at approximately 10:25 p.m., Sarah Anderson, a 16 year old student at Prout High School was driving home to Charlestown from her boyfriend's house in Stonington, Connecticut. She testified she left her house at about 10:00 p.m. and stopped for coffee at Bess Eaton's in Stonington. As she drove home through Westerly before reaching Route 1 she was travelling north on Airport Road near Tom Harvey Road. According to Miss Anderson as she was travelling on Airport Road she was involved in a head-on collision with a car she later learned was operated by the defendant. Miss Anderson was seriously injured in the collision and has no memory of the accident or how it occurred. There were no witnesses to this accident.
Westerly Police Sergeant Margaret Lord was the first officer to arrive at the scene. According to Lord she was near the scene of the accident and was approached by a passing motorist who informed her of the collision. Lord immediately radioed the station and responded to the scene. Upon her arrival she first went to the Anderson vehicle and found Sarah Anderson, pinned inside the vehicle and screaming hysterically. Lord called for rescue personnel and checked the second vehicle driven by Salvatore Guido, the defendant. Sergeant Lord testified the defendant was unconscious and did not say anything. Lord did speak with Anderson who gave her a statement to the effect that "it (the collision) may have been my fault, I may have been in the other lane — my mother's going to kill me."
Mario Rebello, an emergency medical technician (EMT) responded to the scene. He testified he first checked the Anderson vehicle and observed her to be conscious, alert with a laceration on her forehead. Anderson was pinned in the vehicle and was subsequently treated for multiple trauma including a fractured skull, two broken legs, fractured hip, broken ribs, punctured lung and fractured wrist. It took over one hour to remove her from the vehicle. She subsequently underwent extensive surgery and rehabilitation.
Rebello next approached the second vehicle and observed a single male occupant who was unconscious and laying in the front seat. According to Rebello this person was unconscious and gave no response to his inquiries. That man was this defendant. Rebello also noticed an open bottle of Budweiser Beer on the front passenger side of the car. Rebello began to employ emergency treatment, he secured the defendant's airway and began to place him in traction. Randy Sposato, a member of the Westerly Ambulance Corp arrived at the Guido vehicle and undertook immediate life support measures including the first of several intravenous injections of saline lactate ringers in two separate I.V.'s for fluid replacement. This was accomplished by a pressure infuser to increase the rate of flow to the body. According to Sposato no other medications were administered and no swabs or materials containing alcohol were used. The patient was transferred to Westerly Hospital where he was picked up by helicopter and flown to Rhode Island Hospital. According to Sposato the patient received 2000cc's of intravenous fluids.
Angela G. Rivers, testified she was the nurse aboard the Lifestar Helicopter which transported the defendant. According to Rivers, Guido was in critical condition and had 2 I.V.'s in one arm. Rivers maintained the I.V.'s and 10 mg. of Norcuran to paralyze the patient and keep him from moving. The patient received 3500cc's of fluids before he arrived at Rhode Island Hospital plus the Norcuran injection.
Upon arrival at Rhode Island Hospital the defendant was transported to the trauma room for emergent treatment. Kelly Karpik was the nurse in charge of the patient at Rhode Island Hospital Emergency Room. Blood was drawn in preparation for surgery. Several tests were ordered including a toxicology screen for his blood alcohol level. According to Karpik the blood alcohol is routinely ordered so that the medical personnel can determine his mental status and whether or not it is compromised. This procedure is followed for all persons admitted to the trauma rooms at the hospital. Karpik testified and Dr. Torri confirmed that he drew the blood through a femoral vein with a femoral stick at approximately 12:07 a.m. on May 16, 1993. According to Dr. Torri no alcohol or alcohol swabs were used during this procedure.
Doreen Osgood, a lab technician at Rhode Island Hospital testified she analyzed the blood at 12:07 a.m. on May 16, 1993. Osgood used a Hewlett Packard Gas Chromatograph to perform the analysis on the one sample that was submitted. This analysis was conducted on serum blood not whole blood and resulted a blood alcohol concentration which measured 240 mg/DL ethanol. Thus, the alcohol content was measured in milligrams per deciliter and not by weight per volume as required by § 31-27-2.
Dennis Hilliard, the Acting Director of the Rhode Island State Crime Laboratory at the University of Rhode Island, testified as an expert witness in pharmacology and toxicology relating to blood alcohol concentration. According to Mr. Hilliard serum blood is distinguishable from whole blood in that the cellular material has been extracted by centrifugation. Since the alcohol is partitioned unevenly between the cellular material and the liquid, there is a difference in concentration. Serum blood averages about 18 percent higher weight per volume of alcohol than whole blood, although the reported differences range from 15 percent to 23 percent.
Hilliard testified he is familiar with the standards used to measure blood alcohol in DWI cases by the Rhode Island Department of Health. He stated that under state law, blood alcohol concentration is measured by grams percent or grams per 100 ml. of whole blood. The serum blood alcohol level of the defendant was reported as two hundred forty milligrams per deciliter (240 mg/DL) as opposed to grams per 100 ml. Hilliard testified that by a simple mathematical exercise he converted the 240 milligrams per deciliter into grams per 100 milliliters. He then testified that by using information provided by the arresting agency regarding a time frame of when the defendant began drinking, the time of the accident and the time of the blood test he can then make a prediction of what the driver's blood alcohol level was at the time of the stop.
Hilliard further testified that the regulations promulgated by the Department of Health require only one sample be taken when the test is for blood as opposed to breath where two samples, thirty minutes apart are required.
According to Hilliard, the infusion of lactate ringers of saline solutions into a person who has suffered a loss of blood would serve to dilute the alcohol level remaining blood. Also, some of the alcohol in the driver's blood would be bled out along with the blood loss suffered by the patient. Hilliard concluded that the overall blood alcohol concentration would be decreased by these measures and not increased.
Over vigorous objection a hypothetical question was posed to the witness. Hilliard was asked to assume an individual began drinking at approximately 6:00 p.m., is involved in an accident at 10:25 p.m. that it is unknown when he consumed his last drink, and that a blood alcohol drawn at 12:07 a.m. the following day results in a blood alcohol level of .023 percent of whole blood. Hilliard was then asked if he could determine the likely blood alcohol level at the time of the collision.
Hilliard answered that by using the average rates at which an individual absorbs and metabolizes alcohol and considering that an individual's blood alcohol will peak within thirty to ninety minutes after the last drink, he then calculated a blood alcohol range for an average individual at the relevant time period. Hilliard testified that if the individual submitted to tests for his metabolic rate for alcohol than a more accurate determination of his blood alcohol level at the time of the accident could be made. Without those tests Hilliard could only use the average rate at which an individual metabolizes alcohol which ranges from 0.01 percent to 0.02 percent per hour. Hilliard stated these averages are generally accepted in the scientific community.
Hilliard testified that the defendant's blood alcohol content at 12:07 a.m. was the equivalent of 0.203 percent. He estimated that the blood alcohol level would have peaked some thirty to ninety minutes after the accident. He based this estimate on the fact the defendant ingested no more alcohol after the collision and that an average individual will have peaked some thirty to ninety minutes after the final dose of alcohol. Hilliard acknowledged there was no evidence as to when the defendant consumed his last drink. He used the 10:25 p.m. collision time as the frame of reference for the last ingestion of alcohol. Using the average metabolic rate of .015 percent per hour, Hilliard estimated the defendant's blood alcohol content was at its peak at 10:55 p.m. at the thirty minute level and 11:55 p.m. at the ninety minute level.
Hilliard testified the time of the test was 12:07 a.m. He then added in the amount the subject would have metabolized from the point of peak alcohol level to the time of the test. He used the average metabolic rate of .015 percent and multiplied it by 1.2 hours. He concluded the subject would have metabolized about .018 percent of the alcohol in their system. Thus at 10:55 p.m. the subject's peak value was .221 percent. Using the same formula Hilliard concluded the subject's peak alcohol level at 11:55 p.m. was .206 percent.
Noting that the collision occurred before the individual's blood alcohol reached its peak level Hilliard testified the person was "still on the absorption side of the curve, during which the blood alcohol concentration increases at the rate of approximately .02 percent per hour. He thereupon concluded at 10:25 p.m. the individual's blood alcohol level was .211 percent with a thirty minute absorption rate and .176 percent with an absorption rate of ninety minutes.
Hilliard concluded that the individual's blood alcohol level ranged from as low as .176 to as high as .211 percent at the time of the accident. He added that if the replacement fluid therapy had not been administered then the estimated blood alcohol levels could have been significantly higher.
Unquestionably Hilliard's calculations were estimates of the defendant's blood alcohol level at the time of the collision. These estimates were based on assumptions that the defendant was ingesting alcohol over a normal ingestion period, using the average absorption figures. According to Hilliard, the more information he has concerning the type of alcohol consumed, the consumption rate a person's body weight and the time a person stopped drinking the better the estimate he can give. However, while this data is helpful, Hilliard insisted he could still do a calculation based on the figures presented and that as a scientist he was comfortable with these figures.
Defendant's argument that the results of a test of his blood must be suppressed because it was obtained as a result of an illegal search and seizure must fail. In State v. Lussier,511 A.2d 958 (R.I. 1986) the Supreme Court clearly and unequivocally held that when the blood test is ordered by an emergency room physician during the course of medical treatment or evaluation of the defendant there is no police involvement, no state action and the Fourth Amendment is simply not applicable.
The defendant also raised the General Laws 1956 (1985 Reenactment) § 9-17-24 as a privilege he enjoys which prevents the production and use of his medical health care information including the results of any analysis of his blood.
This issue has been recently addressed by the Rhode Island Supreme Court in State v. Raynaldo Almonte, 644 A.2d 295 (R.I. 1994) where the Court declared § 9-17-24 to be an unconstitutional intrusion upon the judicial power of the state to adjudicate both civil and criminal cases.
The final issue concerns the admissibility of the defendant's blood test results when the provisions of § 31-27-2 and § 31-27-3
have not been followed. The State argues that where the State did not seek to draw the blood and no state action is involved, the provisions of § 31-27-2 and § 31-27-3 do not apply.
Where the State seeks to introduce evidence of the amount of blood in a defendant's blood in a prosecution for violations of §31-27-2, Driving Under the Influence of Liquor or Drugs or §31-27-2.6, Driving Under the Influence of Liquor or Drugs Resulting in Serious Bodily Injury, the State must show that the defendant consented to the taking of the test and that the test was administered according to methods approved by the Department of Health. State v. Timms, 505 A.2d 1132 (R.I. 1986). Additionally, § 31-27-2(C)(3) requires the State to demonstrate that a true copy of the test results be mailed to the defendant within thirty days of the taking of the test. Finally, § 31-27-3
requires the State to show that the defendant was given the right immediately after his arrest to be examined by a physician selected by him, and the arresting officer did immediately inform the defendant of this right and afford him a reasonable opportunity to exercise that right.
The Supreme Court has ruled that when the arresting officer informs the defendant of his rights to an independent examination by a physician selected by him and affords the defendant the opportunity to use the telephone, the requirements of § 31-27-3
have been met. State v. Langella, Sup. Ct. Op. No. 94-337-C.A.,650 A.2d 478 (R.I. 1992). In Langella the Court had occasion to construe the phrase "the officer arresting or so charging
such person must have informed such person of this right. . . (Emphasis Added). The Court held it mattered not whether the officer who actually effected the arrest so informed the defendant on whether another officer did so as long as the defendant was informed by someone.
Clearly § 31-27-3 contemplates situations in which a defendant is under arrest. The intent of the statute is to afford drivers who are taken into police custody an opportunity to be examined on the question of intoxication by a physician of his choice. State v. Langella, supra.
Clearly, § 31-27-3 does not apply to this case. Mr. Guido was not under arrest. He was unconscious as a result of the collision and his condition was described as critical and life threatening. To rule that the police must have afforded the defendant an opportunity for another medical examination on the question of his intoxication would defeat the clear intent of the Legislature to reduce the carnage occurring on our highways and would achieve an absurd result. Thus, the Court finds the State need not demonstrate compliance with the provisions of § 31-27-3 where the defendant is neither arrested nor charged with a violation of §31-27-2.6.
The Court further finds that the requirements of § 31-27-2(C) do not apply to the facts of this case.
The evidence of the level of alcohol in defendant's blood at the time of the collision does not fall within the provisions of § 31-27-2. This evidence is a result of the production of defendant's hospital records and was the result of actions taken by personnel at Rhode Island Hospital. State v. Lussier,511 A.2d 958 (R.I. 1986). The Court finds there was no police involvement either direct or indirect in the taking of a sample of defendant's blood at Rhode Island Hospital. Section 31-27-2
was intended by the Legislature to provide a driver with certain statutory protections concerning the taking and admissibility of chemical tests of one's blood, breath or urine when that person is under arrest, State v. Timms, supra, or is taken to the hospital but remains conscious and in the custody of the police. None of those facts are present here. The State lawfully obtained the results of a test of the defendant's blood from his hospital records State v. Almonte, supra; Bartlett v. Danti,503 A.2d 515 (R.I. 1986). The State is entitled to introduce this evidence as bearing on the issue of the defendant's intoxication.
Clearly the medical records must be interpreted by expert testimony. The fact that Dennis Hilliard employs average metabolic rates and rates of absorption and testifies in terms of estimates is not fatal to the admissibility of this evidence. While the conditional aspects of Hilliard's testimony clearly affect the weight of his testimony, it remains for the jury to decide whether the defendant was intoxicated on the night in question and whether the injuries to Sarah Anderson were a proximate result of the manner of operation of the defendant's motor vehicle. State v. Benoit, Sup. Ct. Op. No. 93-503-C.A., ___ A.2d ___ (R.I. 1992).
The defendant's motion to suppress the results of a test of his blood performed at Rhode Island Hospital is denied.